(Slip Opinion) OCTOBER TERM, 2008 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ALTRIA GROUP, INC., ET AL. *v.* GOOD ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 07–562. Argued October 6, 2008—Decided December 15, 2008

Respondents, smokers of petitioners' "light" cigarettes, filed suit, alleging that petitioners violated the Maine Unfair Trade Practices Act (MUTPA) by fraudulently advertising that their "light" cigarettes delivered less tar and nicotine than regular brands. The District Court granted summary judgment for petitioners, finding the state-law claim pre-empted by the Federal Cigarette Labeling and Advertising Act (Labeling Act). The First Circuit reversed, holding that the Labeling Act neither expressly nor impliedly pre-empts respondents' fraud claim.

*Held:* Neither the Labeling Act's pre-emption provision nor the Federal Trade Commission's actions in this field pre-empt respondents' state-law fraud claim. Pp. 5–20.

(a) Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose. See *Jones* v. *Rath Packing Co.,* 430 U. S. 519, 525. When the text of an express pre-emption clause is susceptible of more than one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption." *Bates* v. *Dow Agrosciences LLC*, 544 U. S. 431, 449. The Labeling Act's stated purposes are to inform the public of the health risks of smoking while protecting commerce and the economy from the ill effects of nonuniform requirements to the extent consistent with the first goal. Although fidelity to these purposes does not demand the pre-emption of state fraud rules, the principal question here is whether that result is nevertheless required by 15 U. S. C. §1334(b), which provides that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." Pp. 5–9.

Syllabus

(b) Respondents' claim is not expressly pre-empted by §1334(b). As determined in *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504, and *Lorillard Tobacco Co.* v. *Reilly*, 533 U. S. 525, the phrase "based on smoking and health" modifies the state-law rule at issue rather than a particular application of that rule. The *Cipollone* plurality concluded that "the phrase 'based on smoking and health' fairly but narrowly construed" did not pre-empt the *Cipollone* plaintiff's common-law claim that cigarette manufacturers had fraudulently misrepresented and concealed a material fact, because the claim alleged a violation of a duty not to deceive—a duty that is not "based on" smoking and health. 505 U. S., at 528–529. Respondents here also allege a violation of the duty not to deceive as codified in the MUTPA, which, like the common-law duty in *Cipollone*, has nothing to do with smoking and health. Respondents' claim is not analogous to the "warning neutralization" claim found to be pre-empted in *Cipollone*. *Reilly* is consistent with *Cipollone*'s analysis. This Court disagrees with petitioners' alternative argument that the express pre-emption framework of *Cipollone* and *Reilly* should be rejected. *American Airlines, Inc.* v. *Wolens*, 513 U. S. 219, and *Riegel* v. *Medtronic, Inc.*, 552 U. S. ___, are distinguished. Pp. 9–16.

(c) Various Federal Trade Commission decisions with respect to statements of tar and nicotine content do not impliedly pre-empt state deceptive practices rules like the MUTPA. Pp. 17–20.

501 F. 3d 29, affirmed and remanded.

STEVENS, J., delivered the opinion of the Court, in which KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which ROBERTS, C. J., and SCALIA and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–562

ALTRIA GROUP, INC., ET AL., PETITIONERS *v.*
STEPHANIE GOOD ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[December 15, 2008]

JUSTICE STEVENS delivered the opinion of the Court.

Respondents, who have for over 15 years smoked "light" cigarettes manufactured by petitioners, Philip Morris USA, Inc., and its parent company, Altria Group, Inc., claim that petitioners violated the Maine Unfair Trade Practices Act (MUTPA). Specifically, they allege that petitioners' advertising fraudulently conveyed the message that their "light" cigarettes deliver less tar and nicotine to consumers than regular brands despite petitioners' knowledge that the message was untrue. Petitioners deny the charge, asserting that their advertisements were factually accurate. The merits of the dispute are not before us because the District Court entered summary judgment in favor of petitioners on the ground that respondents' state-law claim is pre-empted by the Federal Cigarette Labeling and Advertising Act, as amended (Labeling Act). The Court of Appeals reversed that judgment, and we granted certiorari to review its holding that the Labeling Act neither expressly nor impliedly pre-empts respondents' fraud claim. We affirm.

I

Respondents are Maine residents and longtime smokers of Marlboro Lights and Cambridge Lights cigarettes, which are manufactured by petitioners. Invoking the diversity jurisdiction of the Federal District Court, respondents filed a complaint alleging that petitioners deliberately deceived them about the true and harmful nature of "light" cigarettes in violation of the MUTPA, Me. Rev. Stat. Ann., Tit. 5, §207 (Supp. 2008).[1] Respondents claim that petitioners fraudulently marketed their cigarettes as being "light" and containing "'[l]owered [t]ar and [n]icotine'" to convey to consumers that they deliver less tar and nicotine and are therefore less harmful than regular cigarettes. App. 28a–29a.

Respondents acknowledge that testing pursuant to the Cambridge Filter Method[2] indicates that tar and nicotine yields of Marlboro Lights and Cambridge Lights are lower than those of regular cigarettes. *Id.*, at 30a. Respondents allege, however, that petitioners have known at all relevant times that human smokers unconsciously engage in compensatory behaviors not registered by Cambridge Filter Method testing that negate the effect of the tar- and

_____

[1] The MUTPA provides, as relevant, that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful." §207. In construing that section, courts are to "be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to Section 45(a)(1) of the Federal Trade Commission Act (15 United States Code 45(a)(1)), as from time to time amended." §207(1).

[2] The Cambridge Filter Method weighs and measures the tar and nicotine collected by a smoking machine that takes 35 milliliter puffs of two seconds' duration every 60 seconds until the cigarette is smoked to a specified butt length. App. 294a, 668a. As discussed below, the Federal Trade Commission (FTC or Commission) signaled in 1966 that the Cambridge Filter Method was an acceptable means of measuring the tar and nicotine content of cigarettes, but it never required manufacturers to publish test results in their advertisements.

nicotine-reducing features of "light" cigarettes. *Id.*, at 30a–31a. By covering filter ventilation holes with their lips or fingers, taking larger or more frequent puffs, and holding the smoke in their lungs for a longer period of time, smokers of "light" cigarettes unknowingly inhale as much tar and nicotine as do smokers of regular cigarettes. *Ibid.* "Light" cigarettes are in fact more harmful because the increased ventilation that results from their unique design features produces smoke that is more mutagenic per milligram of tar than the smoke of regular cigarettes. *Id.*, at 31a–32a. Respondents claim that petitioners violated the MUTPA by fraudulently concealing that information and by affirmatively representing, through the use of "light" and "lowered tar and nicotine" descriptors, that their cigarettes would pose fewer health risks. *Id.*, at 32a, 33a.

Petitioners moved for summary judgment on the ground that the Labeling Act, 15 U. S. C. §1334(b), expressly preempts respondents' state-law cause of action. Relying on our decisions in *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504 (1992), and *Lorillard Tobacco Co.* v. *Reilly*, 533 U. S. 525 (2001), the District Court concluded that respondents' MUTPA claim is pre-empted. The court recast respondents' claim as a failure-to-warn or warning neutralization claim of the kind pre-empted in *Cipollone:* The claim charges petitioners with "produc[ing] a product it knew contained hidden risks . . . not apparent or known to the consumer"—a claim that "runs to what [petitioners] actually said about Lights and what [respondents] claim they should have said." 436 F. Supp. 2d 132, 151 (Me. 2006). And the difference between what petitioners said and what respondents would have them say is "'intertwined with the concern about cigarette smoking and health.'" *Id.*, at 153 (quoting *Reilly*, 533 U. S., at 548). The District Court thus concluded that respondents' claim rests on a state-law requirement based on smoking and health of

precisely the kind that §1334(b) pre-empts, and it granted summary judgment for petitioners.

Respondents appealed, and the Court of Appeals reversed. The Court of Appeals first rejected the District Court's characterization of respondents' claim as a warning neutralization claim akin to the pre-empted claim in *Cipollone*. 501 F. 3d 29, 37, 40 (CA1 2007). Instead, the court concluded that respondents' claim is in substance a fraud claim that alleges that petitioners falsely represented their cigarettes as "light" or having "lowered tar and nicotine" even though they deliver to smokers the same quantities of those components as do regular cigarettes. *Id.*, at 36. "The fact that these alleged misrepresentations were unaccompanied by additional statements in the nature of a warning does not transform the claimed fraud into failure to warn" or warning neutralization. *Id.*, at 42–43. Finding respondents' claim indistinguishable from the non-pre-empted fraud claim at issue in *Cipollone*, the Court of Appeals held that it is not expressly preempted. The court also rejected petitioners' argument that respondents' claim is impliedly pre-empted because their success on that claim would stand as an obstacle to the purported policy of the FTC allowing the use of descriptive terms that convey Cambridge Filter Method test results. Accordingly, it reversed the judgment of the District Court.

In concluding that respondents' claim is not expressly pre-empted, the Court of Appeals considered and rejected the Fifth Circuit's reasoning in a similar case. 501 F. 3d, at 45. Unlike the court below, the Fifth Circuit likened the plaintiffs' challenge to the use of "light" descriptors to *Cipollone*'s warning neutralization claim and thus found it expressly pre-empted. *Brown* v. *Brown & Williamson Tobacco Corp.*, 479 F. 3d 383, 392–393 (2007). We granted the petition for certiorari to resolve this apparent conflict. 552 U. S. ___ (2008).

## II

Article VI, cl. 2, of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Consistent with that command, we have long recognized that state laws that conflict with federal law are "without effect." *Maryland* v. *Louisiana,* 451 U. S. 725, 746 (1981).

Our inquiry into the scope of a statute's pre-emptive effect is guided by the rule that "'[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case." *Medtronic, Inc.* v. *Lohr*, 518 U. S. 470, 485 (1996) (quoting *Retail Clerks* v. *Schermerhorn,* 375 U. S. 96, 103 (1963)). Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose. See *Jones* v. *Rath Packing Co.,* 430 U. S. 519, 525 (1977). If a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains. Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law. *Freightliner Corp.* v. *Myrick*, 514 U. S. 280, 287 (1995).

When addressing questions of express or implied pre-emption, we begin our analysis "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230 (1947). That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States. *Lohr*, 518 U. S., at 485; see also *Reilly*, 533 U. S., at 541–542 ("Because 'federal law is said to bar state action in [a]

fiel[d] of traditional state regulation,' namely, advertising, we 'wor[k] on the assumption that the historic police powers of the States [a]re not to be superseded by the Federal Act unless that [is] the clear and manifest purpose of Congress' " (citation omitted)).  Thus, when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption."  *Bates* v. *Dow Agrosciences LLC*, 544 U. S. 431, 449 (2005).

Congress enacted the Labeling Act in 1965[3] in response to the Surgeon General's determination that cigarette smoking is harmful to health.  The Act required that every package of cigarettes sold in the United States contain a conspicuous warning, and it pre-empted state-law positive enactments that added to the federally prescribed warning.  79 Stat. 283.  Congress amended the Labeling Act a few years later by enacting the Public Health Cigarette Smoking Act of 1969.[4]  The amendments strengthened the language of the prescribed warning, 84 Stat. 88, and prohibited cigarette advertising in "any medium of electronic communication subject to [FCC] jurisdiction," *id.,* at 89.  They also broadened the Labeling Act's pre-emption provision.  See *Cipollone*, 505 U. S., at 520 (plurality opinion) (discussing the difference in scope of the pre-emption clauses of the 1965 and 1969 Acts).  The Labeling Act has since been amended further to require cigarette manufacturers to include four more explicit warnings in their packaging and advertisements on a rotating basis.[5]

The stated purpose of the Labeling Act is

"to establish a comprehensive Federal program to deal

---

[3] 79 Stat. 282.

[4] Pub. L. 91–222, 84 Stat. 87.  Though actually enacted in 1970, Congress directed that it be cited as a "1969 Act."

[5] Comprehensive Smoking Education Act, Pub. L. 98–474, §4(a), 98 Stat. 2201, 15 U. S. C. §1333(a).

with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby—

"(1) the public may be adequately informed that cigarette smoking may be hazardous to health by inclusion of a warning to that effect on each package of cigarettes; and

"(2) commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, non-uniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health." 79 Stat. 282, 15 U. S. C. §1331.

The requirement that cigarette manufacturers include in their packaging and advertising the precise warnings mandated by Congress furthers the Act's first purpose. And the Act's pre-emption provisions promote its second purpose.

As amended, the Labeling Act contains two express pre-emption provisions. Section 5(a) protects cigarette manufacturers from inconsistent state labeling laws by prohibiting the requirement of additional statements relating to smoking and health on cigarette packages. 15 U. S. C. §1334(a). Section 5(b), which is at issue in this case, provides that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." §1334(b).

Together, the labeling requirement and pre-emption provisions express Congress' determination that the prescribed federal warnings are both necessary and sufficient to achieve its purpose of informing the public of the health consequences of smoking. Because Congress has decided

that no additional warning statement is needed to attain
that goal, States may not impede commerce in cigarettes
by enforcing rules that are based on an assumption that
the federal warnings are inadequate. Although both of the
Act's purposes are furthered by prohibiting States from
supplementing the federally prescribed warning, neither
would be served by limiting the States' authority to pro-
hibit deceptive statements in cigarette advertising. Peti-
tioners acknowledge that "Congress had no intention of
insulating tobacco companies from liability for inaccurate
statements about the relationship between smoking and
health." Brief for Petitioners 28. But they maintain that
Congress could not have intended to permit the enforce-
ment of *state* fraud rules because doing so would defeat
the Labeling Act's purpose of preventing nonuniform state
warning requirements. 15 U. S. C. §1331.[6] As we ob-

——————

[6] Petitioners also urge us to find support for their claim that Congress
gave the FTC exclusive authority to police deceptive health-related
claims in cigarette advertising in what they refer to as the Labeling
Act's "saving clause." The clause provides that, apart from the warning
requirement, nothing in the Act "shall be construed to limit, restrict,
expand, or otherwise affect the authority of the Federal Trade Commis-
sion with respect to unfair or deceptive acts or practices in the advertis-
ing of cigarettes." §1336. A plurality of this Court has previously read
this clause to "indicat[e] that Congress intended the phrase 'relating to
smoking and health' . . . to be construed narrowly, so as not to pro-
scribe the regulation of deceptive advertising." *Cipollone* v. *Liggett
Group, Inc.*, 505 U. S. 504, 528–529 (1992). Nothing in the clause
suggests that Congress meant to proscribe the States' historic regula-
tion of deceptive advertising practices. The FTC has long depended on
cooperative state regulation to achieve its mission because, although
one of the smallest administrative agencies, it is charged with policing
an enormous amount of activity. See 1 S. Kanwit, Federal Trade
Commission §§1:1, 1:2 (2004 ed. and Supp. 2008). Moreover, when the
Labeling Act was amended in 1969 it was not even clear that the FTC
possessed rulemaking authority, see 84 Stat. 89, making it highly
unlikely that Congress would have intended to assign exclusively to
the FTC the substantial task of overseeing deceptive practices in
cigarette advertisements.

served in *Cipollone*, however, fraud claims "rely only on a single, uniform standard: falsity." 505 U. S., at 529 (plurality opinion).

Although it is clear that fidelity to the Act's purposes does not demand the pre-emption of state fraud rules, the principal question that we must decide is whether the text of §1334(b) nevertheless requires that result.

## III

We have construed the operative phrases of §1334(b) in two prior cases: *Cipollone*, 505 U. S. 504, and *Reilly*, 533 U. S. 525. On both occasions we recognized that the phrase "based on smoking and health" modifies the state-law rule at issue rather than a particular application of that rule.

In *Cipollone*, the plurality, which consisted of Chief Justice Rehnquist and Justices White, O'Connor, and STEVENS, read the pre-emption provision in the 1969 amendments to the Labeling Act to pre-empt common-law rules as well as positive enactments. Unlike Justices Blackmun, KENNEDY, and SOUTER, the plurality concluded that the provision does not preclude all common-law claims that have some relationship to smoking and health. 505 U. S., at 521–523. To determine whether a particular common-law claim is pre-empted, the plurality inquired "whether the legal duty that is the predicate of the common-law damages action constitutes a 'requirement or prohibition based on smoking and health . . . with respect to . . . advertising or promotion,' giving that clause a fair but narrow reading." *Id.*, at 524.

Applying this standard, the plurality held that the plaintiff's claim that cigarette manufacturers had fraudulently misrepresented and concealed a material fact was not pre-empted. That claim alleged a violation of the manufacturers' duty not to deceive—a duty that is not "based on" smoking and health. *Id.*, at 528–529. Respon-

dents in this case also allege a violation of the duty not to deceive as that duty is codified in the MUTPA. The duty codified in that state statute, like the duty imposed by the state common-law rule at issue in *Cipollone*, has nothing to do with smoking and health.[7]

Petitioners endeavor to distance themselves from that holding by arguing that respondents' claim is more analogous to the "warning neutralization" claim found to be preempted in *Cipollone*. Although the plurality understood the plaintiff to have presented that claim as a "theory of fraudulent misrepresentation," *id.*, at 528, the gravamen of the claim was the defendants' failure to warn, as it was "predicated on a state-law prohibition against statements in advertising and promotional materials that tend to minimize the health hazards associated with smoking," *id.*, at 527. Thus understood, the *Cipollone* plurality's analysis of the warning neutralization claim has no application in this case.[8]

––––––––––

[7] In his dissent, JUSTICE THOMAS criticizes our reliance on the plurality opinion in *Cipollone*, *post*, at 6–8, 14–19, 22, and advocates adopting the analysis set forth by JUSTICE SCALIA in his opinion concurring in the judgment in part and dissenting in part in that case, *post*, at 3–6, 19–21. But JUSTICE SCALIA's approach was rejected by seven Members of the Court, and in the almost 17 years since *Cipollone* was decided Congress has done nothing to indicate its approval of that approach. Moreover, JUSTICE THOMAS fails to explain why Congress would have intended the result that JUSTICE SCALIA's approach would produce— namely, permitting cigarette manufacturers to engage in fraudulent advertising. As a majority of the Court concluded in *Cipollone*, nothing in the Labeling Act's language or purpose supports that result.

[8] The *Cipollone* plurality further stated that the warning neutralization claim was "merely the converse of a state-law *requirement* that warnings be included in advertising and promotional materials," 505 U. S., at 527, evincing the plurality's recognition that warning neutralization and failure-to-warn claims are two sides of the same coin. JUSTICE THOMAS' criticism of the plurality's treatment of the failure-to-warn claim, *post*, at 16, is beside the point, as no such claim is at issue in this litigation.

Petitioners nonetheless contend that respondents' claim is like the pre-empted warning neutralization claim because it is based on statements that "might create a false impression" rather than statements that are "inherently false." Brief for Petitioners 39. But the extent of the falsehood alleged does not alter the nature of the claim. Nothing in the Labeling Act's text or purpose or in the plurality opinion in *Cipollone* suggests that whether a claim is pre-empted turns in any way on the distinction between misleading and inherently false statements. Petitioners' misunderstanding is the same one that led the Court of Appeals for the Fifth Circuit, when confronted with a "light" descriptors claim, to reach a result at odds with the Court of Appeals' decision in this case. See *Brown*, 479 F. 3d, at 391–393. Certainly, the extent of the falsehood alleged may bear on whether a plaintiff can prove her fraud claim, but the merits of respondents' claim are not before us.

Once that erroneous distinction is set aside, it is clear that our holding in *Cipollone* that the common-law fraud claim was not pre-empted is directly applicable to the statutory claim at issue in this case. As was true of the claim in *Cipollone*, respondents' claim that the deceptive statements "light" and "lowered tar and nicotine" induced them to purchase petitioners' product alleges a breach of the duty not to deceive.[9] To be sure, the presence of the federally mandated warnings may bear on the materiality of petitioners' allegedly fraudulent statements, "but that possibility does not change [respondents'] case from one

_____

[9] As the Court of Appeals observed, respondents' allegations regarding petitioners' use of the statements "light" and "lowered tar and nicotine" could also support a warning neutralization claim. But respondents did not bring such a claim, and the fact that they could have does not, as petitioners suggest, elevate form over substance. There is nothing new in the recognition that the same conduct might violate multiple proscriptions.

about the statements into one about the warnings."   501
F. 3d, at 44.[10]

Our decision in *Reilly* is consistent with *Cipollone*'s
analysis.  *Reilly* involved regulations promulgated by the
Massachusetts attorney general "'in order to address the
incidence of cigarette smoking and smokeless tobacco use
by children under legal age . . . [and] in order to prevent
access to such products by underage customers.'"   533
U. S., at 533 (quoting 940 Code Mass. Regs. §21.01 (2000)).
The regulations did not pertain to the content of any
advertising; rather, they placed a variety of restrictions on
certain cigarette sales and the location of outdoor and
point-of-sale cigarette advertising.   The attorney general
promulgated those restrictions pursuant to his statutory
authority to prevent unfair or deceptive trade practices.
Mass. Gen. Laws, ch. 93A, §2 (West 1996).   But although
the attorney general's authority derived from a general
deceptive practices statute like the one at issue in this
case, the challenged regulations targeted advertising that
tended to promote tobacco use by children instead of pro-
hibiting false or misleading statements.   Thus, whereas
the "prohibition" in *Cipollone* was the common-law fraud
rule, the "prohibitions" in *Reilly* were the targeted regula-

---

[10] JUSTICE THOMAS contends that respondents' fraud claim must be
pre-empted because "[a] judgment in [their] favor will . . . result in a
'requirement' that petitioners represent the effects of smoking on
health in a particular way in their advertising and promotion of light
cigarettes."  *Post*, at 3.  He further asserts that "respondents seek to
*require* the cigarette manufacturers to provide additional warnings
about compensatory behavior, or to *prohibit* them from selling these
products with the 'light' or 'low-tar' descriptors."  *Post*, at 20.  But this
mischaracterizes the relief respondents seek.  If respondents prevail at
trial, petitioners will be prohibited from selling as "light" or "low tar"
only those cigarettes that are not actually light and do not actually
deliver less tar and nicotine.  Barring intervening federal regulation,
petitioners would remain free to make nonfraudulent use of the "light"
and "low-tar" descriptors.

tions. Accordingly, our holding in *Reilly* that the regulations were pre-empted provides no support for an argument that a general prohibition of deceptive practices is "based on" the harm caused by the specific kind of deception to which the prohibition is applied in a given case.

It is true, as petitioners argue, that the appeal of their advertising is based on the relationship between smoking and health. And although respondents have expressly repudiated any claim for damages for personal injuries, see App. 26a, their actual injuries likely encompass harms to health as well as the monetary injuries they allege. These arguments are unavailing, however, because the text of §1334(b) does not refer to *harms* related to smoking and health. Rather, it pre-empts only *requirements and prohibitions—i.e.*, rules—that are based on smoking and health. The MUTPA says nothing about either "smoking" or "health." It is a general rule that creates a duty not to deceive and is therefore unlike the regulations at issue in *Reilly*.[11]

Petitioners argue in the alternative that we should reject the express pre-emption framework established by the *Cipollone* plurality and relied on by the Court in *Reilly*. In so doing, they invoke the reasons set forth in the separate opinions of Justice Blackmun (who especially criticized the plurality's holding that the failure-to-warn claim was pre-empted) and JUSTICE SCALIA (who argued that the fraud claim also should be pre-empted). While we again acknowledge that our analysis of these claims may lack "theoretical elegance," we remain persuaded that it

---

[11] In implementing the MUTPA, neither the state legislature nor the state attorney general has enacted a set of special rules or guidelines targeted at cigarette advertising. As we noted in *Cipollone*, it was the threatened enactment of new state warning requirements rather than the enforcement of pre-existing general prohibitions against deceptive practices that prompted congressional action in 1969. 505 U. S., at 515, and n. 11.

represents "a fair understanding of congressional purpose." *Cipollone*, 505 U. S., at 529–530, n. 27 (plurality opinion).

Petitioners also contend that the plurality opinion is inconsistent with our decisions in *American Airlines, Inc.* v. *Wolens*, 513 U. S. 219 (1995), and *Riegel* v. *Medtronic, Inc.*, 552 U. S. ___ (2008). Both cases, however, are inapposite—the first because it involved a pre-emption provision much broader than the Labeling Act's, and the second because it involved precisely the type of state rule that Congress had intended to pre-empt.

At issue in *Wolens* was the pre-emptive effect of the Airline Deregulation Act of 1978 (ADA), 49 U. S. C. App. §1305(a)(1) (1988 ed.), which prohibits States from enacting or enforcing any law "relating to rates, routes, or services of any air carrier." The plaintiffs in that case sought to bring a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill. Comp. Stat., ch. 815, §505 (West 1992). Our conclusion that the state-law claim was pre-empted turned on the unusual breadth of the ADA's pre-emption provision. We had previously held that the meaning of the key phrase in the ADA's pre-emption provision, "'*relating to* rates, routes, or services,'" is a broad one. *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 383–384 (1992) (emphasis added). Relying on precedents construing the pre-emptive effect of the same phrase in the Employee Retirement Income Security Act of 1974, 29 U. S. C. §1144(a), we concluded that the phrase "relating to" indicates Congress' intent to pre-empt a large area of state law to further its purpose of deregulating the airline industry. 504 U. S., at 383–384.[12] Unquestionably,

────────────

[12] Petitioners also point to *Morales* as evidence that our decision in *Cipollone* was wrong. But *Morales* predated *Cipollone*, and it is in any event even more easily distinguishable from this case than *American Airlines, Inc.* v. *Wolens,* 513 U. S 219 (1995). At issue in *Morales* were guidelines regarding the form and substance of airline fare advertising

the phrase "relating to" has a broader scope than the Labeling Act's reference to rules "based on" smoking and health; whereas "relating to" is synonymous with "having a connection with," *id.*, at 384, "based on" describes a more direct relationship, see *Safeco Ins. Co. of America* v. *Burr*, 551 U. S. ___, ___ (2007) (slip op., at 13) ("In common talk, the phrase 'based on' indicates a but-for causal relationship and thus a necessary logical condition").

Petitioners' reliance on *Riegel* is similarly misplaced. The plaintiffs in *Riegel* sought to bring common-law design, manufacturing, and labeling defect claims against the manufacturer of a faulty catheter. The case presented the question whether those claims were expressly preempted by the Medical Device Amendments of 1976 (MDA), 21 U. S. C. §360c *et seq.* The MDA's pre-emption clause provides that no State "'may establish or continue in effect with respect to a device . . . any requirement' relating to safety or effectiveness that is different from, or in addition to, federal requirements." *Riegel*, 552 U. S., at ___ (slip op., at 14) (quoting 21 U. S. C. §360k(a); emphasis deleted).

The catheter at issue in *Riegel* had received premarket approval from the Food and Drug Administration (FDA). We concluded that premarket approval imposes "requirement[s] relating to safety [and] effectiveness" because the FDA requires a device that has received premarket approval to be made with almost no design, manufacturing, or labeling deviations from the specifications in its approved application. The plaintiffs' products liability

————————

implemented by the National Association of Attorneys General to give content to state deceptive practices rules. 504 U. S., at 379. Like the regulations at issue in *Reilly*, the guidelines were industry-specific directives that targeted the subject matter made off-limits by the ADA's express pre-emption provisions. See also *Rowe* v. *New Hampshire Motor Transp. Assn.*, 552 U. S. ___ (2008) (holding that targeted ground carrier regulations were pre-empted by a statute modeled on the ADA).

claims fell within the core of the MDA's pre-emption pro-
vision because they sought to impose different require-
ments on precisely those aspects of the device that the
FDA had approved.  Unlike the *Cipollone* plaintiff's fraud
claim, which fell outside of the Labeling Act's pre-emptive
reach because it did not seek to impose a prohibition
"based on smoking and health," the *Riegel* plaintiffs' com-
mon-law products liability claims unquestionably sought
to enforce "requirement[s] relating to safety or effective-
ness" under the MDA.  That the "relating to" language of
the MDA's pre-emption provision is, like the ADA's, much
broader than the operative language of the Labeling Act
provides an additional basis for distinguishing *Riegel*.
Thus, contrary to petitioners' suggestion, *Riegel* is entirely
consistent with our holding in *Cipollone*.

In sum, we conclude now, as the plurality did in *Cipol-
lone*, that "the phrase 'based on smoking and health' fairly
but narrowly construed does not encompass the more
general duty not to make fraudulent statements."   505
U. S., at 529.

IV

As an alternative to their express pre-emption argu-
ment, petitioners contend that respondents' claim is impli-
edly pre-empted because, if allowed to proceed, it would
present an obstacle to a longstanding policy of the FTC.
According to petitioners, the FTC has for decades pro-
moted the development and consumption of low tar ciga-
rettes and has encouraged consumers to rely on represen-
tations of tar and nicotine content based on Cambridge
Filter Method testing in choosing among cigarette brands.
Even if such a regulatory policy could provide a basis for
obstacle pre-emption, petitioners' description of the FTC's
actions in this regard are inaccurate.  The Government
itself disavows any policy authorizing the use of "light"
and "low tar" descriptors.   Brief for United States as

*Amicus Curiae* 16–33.

In 1966, following the publication of the Surgeon General's report on smoking and health, the FTC issued an industry guidance stating its view that "a factual statement of the tar and nicotine content (expressed in milligrams) of the mainstream smoke from a cigarette," as measured by Cambridge Filter Method testing, would not violate the FTC Act. App. 478a. The Commission made clear, however, that the guidance applied only to factual assertions of tar and nicotine yields and did not invite "collateral representations . . . made, expressly or by implication, as to reduction or elimination of health hazards." *Id.,* at 479a. A year later, the FTC reiterated its position in a letter to the National Association of Broadcasters. The letter explained that, as a "general rule," the Commission would not challenge statements of tar and nicotine content when "they are shown to be accurate and fully substantiated by tests conducted in accordance with the [Cambridge Filter Method]." *Id.,* at 368a. In 1970, the FTC considered providing further guidance, proposing a rule that would have required manufacturers to disclose tar and nicotine yields as measured by Cambridge Filter Method testing. 35 Fed. Reg. 12671. The leading cigarette manufacturers responded by submitting a voluntary agreement under which they would disclose tar and nicotine content in their advertising, App. 899a–900a, and the FTC suspended its rulemaking, 36 Fed. Reg. 784 (1971).

Based on these events, petitioners assert that "the FTC has *required* tobacco companies to disclose tar and nicotine yields in cigarette advertising using a government-mandated testing methodology and has *authorized* them to use descriptors as shorthand references to those numerical test results." Brief for Petitioners 2 (emphasis in original). As the foregoing history shows, however, the FTC has in fact never required that cigarette manufacturers disclose tar and nicotine yields, nor has it condoned

representations of those yields through the use of "light" or "low tar" descriptors.

Subsequent Commission actions further undermine petitioners' claim. After the tobacco companies agreed to report tar and nicotine yields as measured by the Cambridge Filter Method, the FTC continued to police cigarette companies' misleading use of test results. In 1983, the FTC responded to findings that tar and nicotine yields for Barclay cigarettes obtained through Cambridge Filter Method testing were deceptive because the cigarettes in fact delivered disproportionately more tar to smokers than other cigarettes with similar Cambridge Filter Method ratings. 48 Fed. Reg. 15954. And in 1995, the FTC found that a manufacturer's representation "that consumers will get less tar by smoking ten packs of Carlton brand cigarettes than by smoking a single pack of the other brands" was deceptive even though it was based on the results of Cambridge Filter Method testing. *In re American Tobacco Co.*, 119 F. T. C. 3, 4. The FTC's conclusion was based on its recognition that, "[i]n truth and in fact, consumers will not necessarily get less tar" due to "such behavior as compensatory smoking." *Ibid.*[13]

----

[13] In a different action, the FTC charged a cigarette manufacturer with violating the FTC Act by misleadingly advertising certain brands as "low in tar" even though they had a higher-than-average tar rating. See *In re American Brands, Inc.*, 79 F. T. C. 255 (1971). The Commission and the manufacturer entered a consent order that prevented the manufacturer from making any such representations unless they were accompanied by a clear and conspicuous disclosure of the cigarettes' tar and nicotine content as measured by the Cambridge Filter Method. *Id.*, at 258. Petitioners offer this consent order as evidence that the FTC authorized the use of "light" and "low tar" descriptors as long as they accurately describe Cambridge Filter Method test results. As the Government observes, however, the decree only enjoined conduct. Brief for United States as *Amicus Curiae* 26. And a consent order is in any event only binding on the parties to the agreement. For all of these reasons, the consent order does not support the conclusion that respondents' claim is impliedly pre-empted.

This history shows that, contrary to petitioners' suggestion, the FTC has no longstanding policy authorizing collateral representations based on Cambridge Filter Method test results. Rather, the FTC has endeavored to inform consumers of the comparative tar and nicotine content of different cigarette brands and has in some instances prevented misleading representations of Cambridge Filter Method test results. The FTC's failure to require petitioners to correct their allegedly misleading use of "light" descriptors is not evidence to the contrary; agency nonenforcement of a federal statute is not the same as a policy of approval. Cf. *Sprietsma* v. *Mercury Marine*, 537 U. S. 51 (2002) (holding that the Coast Guard's decision not to regulate propeller guards did not impliedly preempt petitioner's tort claims).[14]

More telling are the FTC's recent statements regarding the use of "light" and "low tar" descriptors. In 1997, the Commission observed that "[t]here are no official definitions for" the terms "light" and "low tar," and it sought comments on whether "there [is] a need for official guidance with respect to the terms" and whether "the descriptors convey implied health claims." 62 Fed. Reg. 48163. In November 2008, following public notice and comment, the Commission rescinded its 1966 guidance concerning the Cambridge Filter Method. 73 Fed. Reg. 74500. The rescission is a response to "a consensus among the public health and scientific communities that the Cambridge Filter method is sufficiently flawed that statements of tar and nicotine yields as measured by that method are not likely to help consumers make informed decisions." *Id.*, at 74503. The Commission's notice of its proposal to rescind

--------

[14] It seems particularly inappropriate to read a policy of authorization into the FTC's inaction when that inaction is in part the result of petitioners' failure to disclose study results showing that Cambridge Filter Method test results do not reflect the amount of tar and nicotine that consumers of "light" cigarettes actually inhale. See *id.,* at 8–11.

the guidance also reiterated the original limits of that guidance, noting that it "only addresse[d] simple factual statements of tar and nicotine yields.  It d[id] not apply to other conduct or express or implied representations, even if they concern[ed] tar and nicotine yields."  *Id.*, at 40351.

In short, neither the handful of industry guidances and consent orders on which petitioners rely nor the FTC's inaction with regard to "light" descriptors even arguably justifies the pre-emption of state deceptive practices rules like the MUTPA.

## V

We conclude, as we did in *Cipollone*, that the Labeling Act does not pre-empt state-law claims like respondents' that are predicated on the duty not to deceive.  We also hold that the FTC's various decisions with respect to statements of tar and nicotine content do not impliedly pre-empt respondents' claim.  Respondents still must prove that petitioners' use of "light" and "lowered tar" descriptors in fact violated the state deceptive practices statute, but neither the Labeling Act's pre-emption provision nor the FTC's actions in this field prevent a jury from considering that claim.  Accordingly, the judgment of the Court of Appeals is affirmed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 07–562

ALTRIA GROUP, INC., ET AL., PETITIONERS *v.*
STEPHANIE GOOD ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[December 15, 2008]

JUSTICE THOMAS, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE ALITO join, dissenting.

This appeal requires the Court to revisit its decision in *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504 (1992). As in that case, the question before us is whether state-law claims alleging that cigarette manufacturers misled the public about the health effects of cigarettes are pre-empted by the Federal Cigarette Labeling and Advertising Act, as amended in 1969 (Labeling Act or Act). The Labeling Act requires that specific health warnings be placed on all cigarette packaging and advertising, 15 U. S. C. §1333, in order to eliminate "diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health," §1331. To that end, §5(b) of the Labeling Act pre-empts any "requirement or prohibition based on smoking and health . . . imposed under State law with respect to the advertising or promotion of any cigarettes." §1334(b).

Whether §5(b) pre-empts state common-law claims divided the Court in *Cipollone*. The plurality opinion found some claims expressly pre-empted and others not, depending on whether "*the legal duty that is the predicate of the common-law damages* action constitutes a requirement or prohibition based on smoking and health . . . imposed under State law with respect to . . . advertising or

promotion." 505 U. S., at 524 (internal quotation marks omitted; emphasis added). A majority of the Court disagreed with the plurality's predicate-duty approach. *Id.,* at 543 (Blackmun, J., concurring in part, concurring in judgment in part, and dissenting in part); *id.,* at 552–554 (SCALIA, J., concurring in judgment in part and dissenting in part). In particular, JUSTICE SCALIA recognized that the plurality's interpretation of §5(b) created an unworkable test for pre-emption with little or no relationship to the text of the statute. *Id.*, at 544, 555–556. The intervening years have vindicated JUSTICE SCALIA's critical assessment; the lower courts have consistently expressed frustration at the difficulty in applying the *Cipollone* plurality's test. Moreover, this Court's recent pre-emption decisions have undermined, and in some cases overruled, central aspects of the plurality's atextual approach to express pre-emption generally, *Riegel* v. *Medtronic, Inc.*, 552 U. S. ___ (2008), and to §5(b) of the Labeling Act specifically, *Lorillard Tobacco Co.* v. *Reilly*, 533 U. S. 525 (2001).

The majority today ignores these problems and adopts the methodology of the *Cipollone* plurality as governing law. As a consequence, the majority concludes that state-law liability for deceiving purchasers about the health effects of smoking light cigarettes is not a "requirement or prohibition based on smoking and health" under the Labeling Act. The Court's fidelity to *Cipollone* is unwise and unnecessary. The Court should instead provide the lower courts with a clear test that advances Congress' stated goals by interpreting §5(b) to expressly pre-empt any claim that "imposes an obligation . . . because of the effect of smoking upon health." *Cipollone*, *supra,* at 554 (opinion of SCALIA, J.).

Respondents' lawsuit under the Maine Unfair Trade Practices Act (MUTPA), Me. Rev. Stat. Ann., Tit. 5, §207 (Supp. 2008), is expressly pre-empted under §5(b) of the

Labeling Act. The civil action is premised on the allegation that the cigarette manufacturers misled respondents into believing that smoking light cigarettes would be healthier for them than smoking regular cigarettes. A judgment in respondents' favor will thus result in a "requirement" that petitioners represent the effects of smoking on health in a particular way in their advertising and promotion of light cigarettes. Because liability in this case is thereby premised on the effect of smoking on health, I would hold that respondents' state-law claims are expressly pre-empted by §5(b) of the Labeling Act. I respectfully dissent.

I

In *Cipollone*, a smoker and her spouse brought state common-law claims for fraud, breach of warranty, and failure to warn against cigarette manufacturers for their alleged failure to adequately disclose the health risks of smoking. 505 U. S., at 509. As here, the cigarette manufacturer asserted that the claims were pre-empted by §5(b) of the Labeling Act.

In deciding the case, the Court could not agree on the meaning of the Labeling Act's express pre-emption provision. It produced three separate opinions, none of which reflected the views of a majority of Justices. Relying heavily on a "presumption against the pre-emption of state police power regulations," a plurality opinion by JUSTICE STEVENS settled on a "narrow reading" of the Labeling Act that tested §5(b)'s pre-emptive effect under a claim-by-claim approach. *Id.,* at 524. This approach considered each state-law claim and asked whether it is predicated "on a duty 'based on smoking and health.'" *Id.,* at 528; see also *id.,* at 524. If so, the claim is pre-empted. *Id.,* at 524, 528. If, however, the claim is predicated on a "more general obligation" under state law, it may proceed. *Id.,* at 528–529.

Applying a test that it conceded lacked "theoretical elegance," *id.,* at 530, n. 27, the plurality held that the failure-to-warn claims were pre-empted "to the extent that those claims rel[ied] on omissions or inclusions in . . . advertising or promotions" of cigarettes. *Id.,* at 531. The same was true for one of the fraud claims, which alleged that the cigarette manufacturers had used their advertising to neutralize the federally required warning labels. *Id.,* at 527–528. The plurality determined that these claims were "predicated on a state-law prohibition against statements . . . that tend to minimize the health hazards associated with smoking." *Id.,* at 527. Thus, according to the plurality, these state-law claims sought recovery under the theory that the cigarette manufacturer breached a duty based on smoking or health. But the plurality found that the other fraud claim, which alleged misrepresentation or concealment of a material fact, was not pre-empted because it was based on a more general state-law obligation: "the duty not to deceive." *Id.,* at 528–529.

Justice Blackmun, writing for three Justices, departed from the plurality on the antecedent question whether the Labeling Act pre-empted state common-law damages claims at all. *Id.,* at 535–542 (opinion, joined by KENNEDY and SOUTER, JJ., concurring in part, concurring in judgment in part, and dissenting in part). He concluded that the phrase "'State law'" in §5(b) referred only to "positive enactments such as statutes and regulations." *Id.,* at 535. But Justice Blackmun specifically noted that even if state common-law claims were within the scope of the Labeling Act, he could not join the plurality's claim-by-claim approach because he "perceive[d] no principled basis for many of the plurality's asserted distinctions among the common-law claims." *Id.,* at 543. Justice Blackmun wrote that Congress could not have "intended to create such a hodgepodge of allowed and disallowed claims when it

amended the pre-emption provision in 1970," and lamented the "difficulty lower courts w[ould] encounter in attempting to implement" the plurality's test. *Id.,* at 543–544.

JUSTICE SCALIA, writing for two Justices, also faulted the plurality for its claim-by-claim approach. *Id.,* at 544–556 (opinion, joined by THOMAS, J., concurring in judgment in part and dissenting in part). Although he agreed with the plurality that the phrase "'State law'" in §5(b) encompassed state common-law claims as well as state statutes and regulations, *id.,* at 548–549, JUSTICE SCALIA objected to the plurality's invocation of a presumption against pre-emption to narrowly interpret §5(b), *id.,* at 544, 545–547. Because Congress had expressed its intent to pre-empt state law by enacting §5(b), the Court's "responsibility [was] to apply to the text ordinary principles of statutory construction." *Id.,* at 545.[1] By employing its "newly crafted doctrine of narrow construction," JUSTICE SCALIA wrote, the plurality arrived at a cramped and unnatural construction of §5(b) that failed to give effect to the statutory text. *Id.*, at 544–548.

Applying "ordinary principles" of statutory construction, *id.,* at 548, JUSTICE SCALIA determined that the proper test for pre-emption of state-law claims under §5(b) was far less complicated than the plurality's claim-by-claim approach. As he explained, "[o]nce one is forced to select a *consistent* methodology for evaluating whether a given legal duty is 'based on smoking and health,' it becomes obvious that the methodology must focus not upon the

————————

[1] JUSTICE SCALIA also criticized the plurality for announcing a new rule that the enactment of an express pre-emption clause eliminates any consideration of implied pre-emption. He explained that this new rule created mischief because, when combined with the presumption against pre-emption, it placed a heavy burden of exactitude on Congress when it wishes to say anything about pre-emption. See *Cipollone*, 505 U. S., at 547–548.

ultimate source of the duty . . . but upon its proximate application." *Id.,* at 553. This "proximate application" test, therefore, focuses not on the state-law duty invoked by the plaintiff, but on the effect of the suit on the cigarette manufacturer's conduct—*i.e.*, the "requirement" or "prohibition" that would be imposed under state law. Put simply, if, "whatever the source of the duty, [the claim] imposes an obligation . . . because of the effect of smoking upon health," it is pre-empted. *Id.,* at 554; see also *id.,* at 555 ("The test for pre-emption in this setting should be one of practical compulsion, *i.e.*, whether the law practically compels the manufacturers to engage in behavior that Congress has barred the States from prescribing directly"). JUSTICE SCALIA also seconded Justice Blackmun's concern that the lower courts would find the plurality's distinctions between materially identical state-law claims to be incapable of application: "A disposition that raises more questions than it answers does not serve the country well." *Id.,* at 556.

## II

Sixteen years later, we must confront *Cipollone* to resolve the question presented in this case: whether respondents' class-action claims for fraudulent marketing under the MUTPA are pre-empted by §5(b) of the Labeling Act. The majority adheres to *Cipollone* because it "remain[s] persuaded" that the plurality's construction of the §5(b) was "'fair.'" *Ante,* at 13–14. I disagree. The Court should discard the *Cipollone* plurality's ill-conceived predicate-duty approach and replace it with JUSTICE SCALIA's far more workable and textually sound "proximate application" test.

The majority does not assert that the *Cipollone* plurality opinion is binding precedent, and rightly so. Because the "plurality opinion . . . did not represent the views of a majority of the Court, we are not bound by its reasoning."

*CTS Corp.* v. *Dynamics Corp. of America*, 481 U. S. 69, 81 (1987) (footnote omitted). At most, *Cipollone* is a "point of reference for further discussion." *Texas* v. *Brown*, 460 U. S. 730, 737 (1983) (plurality opinion). But even if the plurality opinion had some force beyond its mere persuasive value, it nevertheless should be abandoned. It is unworkable; it has been overtaken by more recent decisions of this Court; and it cannot be reconciled with a commonsense reading of the text of §5(b).

A

As predicted by a majority of the Justices in *Cipollone*, the plurality opinion's claim-by-claim approach has proved unworkable in the lower federal courts and state courts. The District Court in this case properly observed that "courts remain divided about what the decision means and how to apply it" and that "*Cipollone*'s distinctions, though clear in theory, defy clear application." 436 F. Supp. 2d 132, 142 (Me. 2006). Other courts have expressed similar frustration with the *Cipollone* framework. See, *e.g., Glassner* v. *R. J. Reynolds Tobacco Co.*, 223 F. 3d 343, 348 (CA6 2000) ("Applying the plurality opinion in *Cipollone* to the Complaint in the present case is no easy task"); *Huddleston* v. *R. J. Reynolds Tobacco Co.*, 66 F. Supp. 2d 1370, 1380 (ND Ga. 1999) ("It would be an understatement to say that it is difficult to apply the plurality opinion in *Cipollone* to the Amended Complaint in this case. It is an impossibility"); *In re Welding Fume Prods. Liability Litigation*, 364 F. Supp. 2d 669, 681, n. 13 (ND Ohio 2005) ("[I]n *Cipollone*, the Supreme Court . . . delivered a fractured plurality opinion that is not easy to comprehend"); *Whiteley* v. *Philip Morris, Inc.*, 117 Cal. App. 4th 635, 670, 11 Cal. Rptr. 3d 807, 835–836 (2004) ("[*Cipollone* is] 'difficult' . . . due to the inherent contradiction at the core of the case"); *Mangini* v. *R. J. Reynolds Tobacco Co.*, 21 Cal. Rptr. 2d 232, 244 (Cal. App. 1993) ("*Cipollone* draws no

bright lines amenable to easy application"), aff'd, 7 Cal. 4th 1057, 875 P. 2d 73 (1994).

The Court should not retain an interpretative test that has proved incapable of implementation. "[T]he mischievous consequences to litigants and courts alike from the perpetuation of an unworkable rule are too great." *Swift & Co.* v. *Wickham*, 382 U. S. 111, 116 (1965); *Federal Election Comm'n* v. *Wisconsin Right to Life, Inc.*, 551 U. S. ___, ___ (2007) (slip op., at 20) (SCALIA, J., concurring in part and concurring in judgment) ("*Stare decisis* considerations carry little weight when an erroneous 'governing decisio[n]' has created an 'unworkable' legal regime" (quoting *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991)). We owe far more to the lower courts, which depend on this Court's guidance, and to litigants, who must conform their actions to the Court's interpretation of federal law. The *Cipollone* plurality's test for pre-emption under §5(b) should be abandoned for this reason alone.

B

Furthermore, in the years since *Cipollone* was decided, this Court has altered its doctrinal approach to express pre-emption. The *Cipollone* plurality justified what it described as the "theoretical [in]elegance" of its construction of §5(b) by relying on the presumption against pre-emption, which, it argued, required a narrow, but "fair," construction of the statute. 505 U. S., at 530, n. 27. See, *e.g., id.,* at 518 (majority opinion) ("This presumption reinforces the appropriateness of a narrow reading of §5"); *id.,* at 523 (plurality opinion) ("[W]e must . . . narrowly construe the precise language of §5(b)"); *id.,* at 524 (§5(b) must be given "a fair but narrow reading"); *id.,* at 529 ("[W]e conclude that the phrase 'based on smoking and health' fairly but narrowly construed does not encompass the more general duty not to make fraudulent statements"). Of course, as JUSTICE SCALIA explained, there

was nothing "fair" about imposing an artificially narrow construction on the Labeling Act's pre-emption provision. See *id.,* at 545 (explaining that the presumption against pre-emption "dissolves once there is conclusive evidence of intent to pre-empt in the express words of the statute itself").

Since *Cipollone*, the Court's reliance on the presumption against pre-emption has waned in the express pre-emption context. In 2002, for example, the Court unanimously explained that the "task of statutory construction must in the first instance focus on the plain wording of the [express pre-emption] clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Sprietsma* v. *Mercury Marine*, 537 U. S. 51, 62–63 (internal quotation marks omitted). Without referring to any presumption against pre-emption, the Court decided that the Federal Boat Safety Act of 1971's express pre-emption provision did not pre-empt state-law claims. *Id.,* at 62–64. Most other decisions since *Cipollone* also have refrained from invoking the presumption in the context of express pre-emption. See, *e.g.*, *Rowe* v. *New Hampshire Motor Transp. Assn.*, 552 U. S. \_\_\_ (2008); *Engine Mfrs. Assn.* v. *South Coast Air Quality Management Dist.*, 541 U. S. 246 (2004); *Buckman Co.* v. *Plaintiffs' Legal Comm.*, 531 U. S. 341 (2001); *United States* v. *Locke*, 529 U. S. 89 (2000); *Geier* v. *American Honda Motor Co.*, 529 U. S. 861 (2000).

The Court has invoked the presumption sporadically during this time frame. As the majority notes, *ante,* at 5, *Medtronic, Inc.* v. *Lohr*, 518 U. S. 470 (1996), applied the presumption against pre-emption in deciding that the federal manufacturing and labeling requirements of the Medical Device Amendments of 1976 (MDA) did not pre-empt state common-law claims. *Id.*, at 500–501. Like *Cipollone* before it, *Lohr* produced a fractured decision featuring three opinions. 518 U. S., at 474 (opinion of STEVENS, J.), *id.*, at 503 (BREYER, J., concurring in part

and concurring in judgment), *id.*, at 509 (O'Connor, J., concurring in part and dissenting in part).  And, like *Cipollone*, *Lohr*'s approach to express pre-emption pre-dates the Court's recent jurisprudence on the topic.  In fact, this Court last year revisited the pre-emption provision of the MDA, 21 U. S. C. §360k(a)(1), and did not employ any presumption against pre-emption.  *Riegel* v. *Medtronic, Inc.*, 552 U. S. ___ (2008).  See *infra*, at 11-13.[2]

More recently, in *Reilly*, 533 U. S. 525, a case revisiting the meaning of §5(b) of the Labeling Act, the Court briefly alluded to the presumption, but did not rely on it to reach its decision.  See *id.,* at 541–542, 546–551.  Indeed, the Court's cursory treatment of the presumption in *Reilly* stands in stark contrast to the First Circuit decision it reversed; the First Circuit relied heavily on the "full force" of the presumption to determine that the regulations at issue were not pre-empted.  See *Consolidated Cigar Corp.* v. *Reilly*, 218 F. 3d 30, 38–41 (2000).  This Court, in overturning that judgment, declined to employ the presumption in its construction of §5(b).  See *Reilly*, 533 U. S., at 546–551. JUSTICE STEVENS highlighted this very point in dissent, arguing that if the presumption had been faith-

<hr />

[2] Also, as in *Cipollone* v. *Liggett Group, Inc.,* 505 U. S. 504 (1992), the fractured decision in *Lohr* was a source of confusion for the lower courts.  See *Kemp* v. *Medtronic, Inc.*, 231 F. 3d 216, 224 (CA6 2000) ("The various courts of appeals that have confronted issues of preemption arising under the MDA have struggled mightily with *Lohr*'s language in an effort to discern its holding"); see also *Martin* v. *Medtronic, Inc.*, 254 F. 3d 573, 579 (CA5 2001) ("Because only parts of Justice Stevens's opinion commanded a majority, extracting the final meaning of *Lohr* is no easy task. . . . Although Justice Breyer's concurrence very specifically disavows the view that common law duties cannot provide substantive requirements for the purpose of preemption, neither his concurrence nor the plurality opinion offers much help to us in developing the point").  The confusion was cleared up in *Riegel*.  See *infra*, at 11–13.

fully applied, the result would have been different. *Id.*, at 591–593.

The majority also relies on *Bates* v. *Dow Agrosciences LLC*, 544 U. S. 431 (2005), where the presumption was again mentioned, but only in dicta. As in *Reilly*, the presumption did not drive the Court's construction of the statute at issue. 544 U. S., at 449 (explaining that the presumption meant just that the holding of no pre-emption would have been the same "even if [respondent's] alternative [construction of the statute] were just as plausible as our reading of the text"); see also *id.,* at 457 (THOMAS, J., concurring in judgment in part and dissenting in part) (agreeing that the case should be vacated and remanded and reiterating that the "presumption does not apply . . . when Congress has included within a statute an express pre-emption provision"). At bottom, although the Court's treatment of the presumption against pre-emption has not been uniform, the Court's express pre-emption cases since *Cipollone* have marked a retreat from reliance on it to distort the statutory text.

If any doubt remained, it was eliminated last Term in *Riegel*. The question in *Riegel*, as noted above, was whether the MDA expressly pre-empts state common-law claims "challenging the safety and effectiveness of a medical device given premarket approval by the Food and Drug Administration." 552 U. S., at \_\_\_ (slip op., at 1). Over the dissent of one Justice, the Court held that the state-law claims were pre-empted because the requirements the plaintiffs sought to impose were "'different from, or in addition to, any requirement applicable . . . to the device'" under federal law. *Id.,* at \_\_\_ (slip op., at 2) (quoting 21 U. S. C. §360k(a)(1)). The Court interpreted the statute without reference to the presumption or any perceived need to impose a narrow construction on the provision in order to protect the police power of the States. Rather, the

Court simply construed the MDA in accordance with ordinary principles of statutory construction.

This was not accidental. The dissent focused on the Court's refusal to invoke the presumption in order to save the state-law claims from pre-emption. 552 U. S., at ___ (slip op., at ___) (opinion of GINSBURG, J.). The dissent was adamant that "[f]ederal laws containing a preemption clause do not automatically escape the presumption against pre-emption." *Ibid.* (slip op., at 2–3); *id.,* at ___ (slip op., at 3) ("Where the text of a pre-emption clause is open to more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption'" (quoting *Bates, supra,* at 449)). In accordance with the presumption, the dissent would have found the state-law claims under review to fall beyond the reach of the MDA's express pre-emption provision. 552 U. S., at ___ (slip op., at ___); see also *id.*, at ___, n. 8 (slip op., at 6, n. 8); *id.,* at ___, n. 9 (slip op., at 7, n. 9) (rejecting the majority's construction of §360(d) because "the presumption against pre-emption [is] operative even in construing a preemption clause"). Given the dissent's clear call for the use of the presumption against pre-emption, the Court's decision not to invoke it was necessarily a rejection of any role for the presumption in construing the statute.

JUSTICE STEVENS also declined to invoke the presumption in his opinion. *Id.,* at ___ (opinion concurring in part and concurring in judgment). In his view, the "significance of the pre-emption provision in the [MDA] was not fully appreciated until many years after it was enacted" and, therefore, it is "a statute whose text and general objective cover territory not actually envisioned by its authors." *Id.,* at ___ (slip op., at 1). But JUSTICE STEVENS' opinion in *Riegel*—unlike the majority opinion here, the plurality opinion in *Cipollone*, and the dissenting opinion in *Riegel*—did *not* invoke the presumption to bend the text of the statute to meet the perceived purpose of Congress.

Instead, JUSTICE STEVENS correctly found that "'it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.'" 552 U. S., at ___ (slip op., at 1) (quoting *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U. S. 75, 79–80 (1998)).

In light of *Riegel*, there is no authority for invoking the presumption against pre-emption in express pre-emption cases. The majority here thus turns to *Lohr* to revive the presumption and, in turn, to justify its restrictive reading of the Labeling Act's express pre-emption provision. But, as *Riegel* plainly shows, the Court is no longer willing to unreasonably interpret expressly pre-emptive federal laws in the name of "'congressional purpose,'" *ante*, at 14, or because "Congress has legislated in a field traditionally occupied by the States," *ante*, at 5. The text of the statute must control.

*Riegel* also undermined *Cipollone* in an even more fundamental way: It conclusively decided that a common-law cause of action imposes a state-law "'requiremen[t]'" that may be pre-empted by federal law. 552 U. S., at ___ (slip op., at 11) ("Absent other indication, reference to a State's 'requirements' includes its common-law duties . . . . Indeed, one would think that tort law, applied by juries under a negligence or strict-liability standard, is less deserving of preservation [than regulatory legislation]"). Justice Blackmun's contrary interpretation of §5(b) of the Labeling Act in *Cipollone*, 505 U. S., at 538–539 (opinion concurring in part, concurring in judgment in part, and dissenting in part), which provided the votes necessary for the judgment, thus is no longer tenable. In light of *Riegel*'s rejection of the presumption against pre-emption relied on by the plurality, as well as the definition of "requirements" relied on in Justice Blackmun's concurring opinion, *Cipollone*'s approach to express pre-emption is nothing more than "a remnant of abandoned doctrine."

*Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 855 (1992).

## C

The *Cipollone* plurality's reading of §5(b) of the Labeling Act was further undermined by this Court's decision in *Reilly*, 533 U. S. 525. There, the Court confronted regulations imposed by the Massachusetts attorney general on the location of tobacco advertising pursuant to the Commonwealth's unfair trade practices statute. *Id.,* at 533–536. The Court found the regulations—to the extent they applied to cigarettes—expressly pre-empted because, although Massachusetts remained free to enact "generally applicable zoning restrictions," its imposition of "special requirements or prohibitions 'based on smoking and health' 'with respect to the advertising or promotion of cigarettes'" fell within the ambit of §5(b)'s pre-emptive sweep. *Id.,* at 551.

*Reilly* did not ignore *Cipollone*. It cited the plurality opinion extensively in its discussion of the basic history and text of the Labeling Act. 533 U. S., at 540–546. But in analyzing whether the regulations enacted by the Massachusetts attorney general were expressly pre-empted, the Court was silent about *Cipollone*. 533 U. S., at 546–551. Unlike the District Court, which saw "the central question for purposes of pre-emption [as] whether the regulations create[d] a predicate legal duty based on smoking and health," *id.*, at 537, the Court's substantive examination of the regulations under §5(b) included no mention of the *Cipollone* plurality's "predicate duty" test. See 533 U. S., at 546–551. Instead, the Court disagreed with "the Attorney General's narrow construction" of the statute's "'based on smoking and health'" language, and concluded that the regulations were pre-empted because they were "motivated by" and "intertwined with" the concerns about smoking and health. *Id.,* at 547–548.

*Reilly*, therefore, cannot be reconciled with the *Cipollone* plurality's interpretation of §5(b) of the Labeling Act. The regulations at issue in *Reilly* were enacted to implement a Massachusetts state law imposing a duty against unfair and deceptive trade practices—the same predicate duty asserted under the MUTPA in this case. 533 U. S., at 533. The state-law duty at issue in *Reilly* was no less general than the state-law duty at issue in this case or the state-law fraud claims confronted in *Cipollone*. Compare Mass. Gen. Laws, ch. 93A, §2(a) (West 1996) ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful"), with Me. Rev. Stat. Ann., Tit. 5, §207 (Supp. 2008) ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful"), and *Cipollone, supra*, at 528 (explaining that the "predicate" of the plaintiff's fraudulent misrepresentation claim was "a state-law duty not to make false statements of material fact or to conceal such facts"). Faithful application of the *Cipollone* plurality opinion, therefore, would have required the Court in *Reilly* to uphold the regulations. Indeed, JUSTICE STEVENS argued as much in his dissent. 533 U. S., at 597 (noting that "[n]ary a word in any of the three *Cipollone* opinions supports the thesis that §5 should be interpreted to pre-empt state regulation of the location of signs advertising cigarettes").

And yet, the majority today finds that *Reilly* and *Cipollone* are perfectly compatible. It contends that, although the regulations in question in *Reilly* "derived from a general deceptive practices statute like the one at issue in this case," they were pre-empted because they "targeted advertising that tended to promote tobacco use by children instead of prohibiting false or misleading statements." *Ante*, at 12. According to the majority, that legal duty contrasts with the regulations here, as "[t]he MUTPA says

nothing about either 'smoking' or 'health.'" *Ante,* at 13; see also *ante,* at 10. But the *Cipollone* plurality expressly rejected any distinction between targeted regulations like those in *Reilly* and general duties imposed by the common law. 505 U. S., at 522. In fact, the general duties underlying the failure-to-warn and warning-neutralization claims in *Cipollone*—which the plurality found to be preempted—say nothing about smoking and health. *Id.*, at 524; see also *id.*, at 553 (SCALIA, J., concurring in judgment in part and dissenting in part) (noting that the duty to warn about a product's dangers was not "specifically crafted with an eye toward 'smoking and health'").

Accordingly, *Reilly* is better understood as establishing that even a general duty can impose requirements or prohibitions based on smoking and health. *Reilly* weakened the force of the *Cipollone* plurality's "predicate duty" approach to the pre-emptive effect of §5(b) and cast doubt on its continuing utility.

## D

Finally, the *Cipollone* plurality's approach should be discarded because its "predicate duty" approach is unpersuasive as an initial matter. In considering the warning-neutralization claim, for example, the *Cipollone* plurality asserted that the claim is predicated on a state-law prohibition against minimizing the health risks associated with smoking. 505 U. S., at 527. The Court today reaffirms this view. *Ante*, at 10; see also *ante*, at 13 (describing §5(b) as expressly pre-empting "rules . . . that are based on smoking and health"). But every products liability action, including a failure-to-warn action, applies generally to *all* products. See *Cipollone, supra,* at 553 (opinion of SCALIA, J.). Thus, the "duty" or "rule" involved in a failure-to-warn claim is no more specific to smoking and health than is a common-law fraud claim based on the "duty" or "rule" not to use deceptive or misleading trade practices. Yet only

for the latter was the *Cipollone* plurality content to ignore the context in which the claim is asserted. This shifting level of generality was identified as a logical weakness in the original *Cipollone* plurality decision by a majority of the Court, 505 U. S., at 543 (Blackmun, J., concurring in part, concurring in judgment in part, and dissenting in part); *id.*, at 553–554 (opinion of SCALIA, J.), and it remains equally unconvincing today.

It is therefore unsurprising that the Court's defense of the plurality's confusing test is confined to one sentence and a footnote. See *ante*, at 13–14 ("While we again acknowledge that our analysis of these claims may lack 'theoretical elegance,' we remain persuaded that it represents 'a fair understanding of congressional purpose'" (quoting *Cipollone*, *supra,* at 529–530, n. 27)); *ante,* at 10, n. 7. The majority instead argues that this approach "fails to explain why Congress would . . . permi[t] cigarette manufacturers to engage in fraudulent advertising." *Ante*, at 10, n. 7. But no explanation is necessary; the text speaks for itself. Congress has pre-empted only those claims that would impose "requirement[s] or prohibition[s] based on smoking and health." 15 U. S. C. §1334(b). Thus, if cigarette manufacturers were to falsely advertise their products as "American-made," or "the official cigarette of Major League Baseball," state-law claims arising from that wrongful behavior would not be pre-empted.

Furthermore, contrary to the majority's policy arguments, faithful application of the statutory language does not authorize fraudulent advertising with respect to smoking and health.[3] Any misleading promotional statements

---

[3] The majority's policy-based attack could just as easily be leveled against its own determination that the Labeling Act pre-empts failure-to-warn claims. But just as there is no basis in fact or law to contend that the Labeling Act encourages the marketing of hazardous products without adequate warning labels, *ante,* at 10, n. 8, there is no basis to contend that the text of the Labeling Act permits fraudulent

for cigarettes remain subject to federal regulatory over-
sight under the Labeling Act.  See §1336.  The relevant
question thus is not whether "petitioners will be prohib-
ited from selling as 'light' or 'low tar' only those cigarettes
that are not actually light and do not actually deliver less
tar and nicotine." *Ante*, at 12, n. 10.  Rather, the issue is
whether the Labeling Act allows regulators and juries to
decide, on a state-by-state basis, whether petitioners' light
and low-tar descriptors were in fact fraudulent, or instead
whether §5(b) charged the Federal Government with
reaching a comprehensive judgment with respect to this
question.

Congress chose a uniform federal standard.  Under the
Labeling Act, Congress "establish[ed] a comprehensive
Federal Program to deal with cigarette labeling and ad-
vertising," 15 U. S. C. §1331, so that "commerce and the
national economy may . . . not [be] impeded by diverse,
nonuniform, and confusing cigarette labeling and advertis-
ing regulations with respect to any relationship between
smoking and health," §1331(2)(B).[4]  The majority's dis-
torted interpretation of §5(b) defeats this express congres-
sional purpose, opening the door to an untold number of
deceptive-practices lawsuits across the country.  The
question whether marketing a light cigarette is "'misrep-
resentative'" in light of compensatory behavior "would
almost certainly be answered differently from State to
State."  *Cipollone, supra*, 505 U. S., at 553 (opinion of

—————

advertising.
  [4] The majority contends that the relatively constrained enforcement
power of the Federal Trade Commission (FTC) in 1970 undermines any
argument that Congress intended the Labeling Act to prevent States
from regulating deceptive advertising and marketing of cigarettes.
*Ante*, at 8, n. 6.  I am unwilling to rely on the majority's perception of
the relative power of the FTC in 1970 to ignore Congress' stated pur-
pose in enacting the Labeling Act and the plain meaning of the Act's
express pre-emption provision.

SCALIA, J.). This will inevitably result in the nonuniform imposition of liability for the marketing of light and/or low-tar cigarettes—the precise problem that Congress intended §5(b) to remedy.

In light of these serious flaws in the majority's approach, even if the *Cipollone* plurality opinion were binding precedent, the Court "should not hesitate to allow our precedent to yield to the true meaning of an Act of Congress when our statutory precedent is 'unworkable' or 'badly reasoned.'" *Clark* v. *Martinez*, 543 U. S. 371, 402 (2005) (THOMAS, J., dissenting) (quoting *Holder* v. *Hall*, 512 U. S. 874, 936 (1994) (THOMAS, J., concurring in judgment), in turn quoting *Payne*, 501 U. S., at 827 (some internal quotation marks omitted)). Where, as here, there is "confusion following a splintered decision," that "is itself a reason for reexamining that decision." *Nichols* v. *United States*, 511 U. S. 738, 746 (1994). When a decision of this Court has failed to properly interpret a statute, we should not "place on the shoulders of Congress the burden of the Court's own error." *Girouard* v. *United States*, 328 U. S. 61, 69–70 (1946).[5]

## III

Applying the proper test—*i.e.*, whether a jury verdict on respondents' claims would "impos[e] an obligation" on the cigarette manufacturer "because of the effect of smoking upon health," *Cipollone*, *supra*, at 554 (SCALIA, J., concurring in judgment in part and dissenting in part), respondents' state-law claims are expressly pre-empted by §5(b)

---

[5] The United States, in its *amicus* brief and at oral argument, conspicuously declined to address express pre-emption or defend the *Cipollone* opinion's reasoning. See Brief for United States as *Amicus Curiae* 14–33. Instead, it addressed only the question of implied pre-emption, an issue I do not reach because of my resolution of the question on express pre-emption.

of the Labeling Act. Respondents, longtime smokers of Marlboro Lights, claim that they have suffered an injury as a result of petitioners' decision to advertise these cigarettes as "light" and/or "low-tar and low nicotine products." 436 F. Supp. 2d, at 144–145. They claim that petitioners marketed their cigarettes as "light" and/or "low-tar and low-nicotine products" despite knowledge that light-cigarette smokers would engage in compensatory behavior causing them to inhale at least as much tar and nicotine as smokers of regular cigarettes. *Ibid.* Respondents thus allege that they were misled into thinking that they were gaining a health advantage by smoking the light cigarettes, *ibid.*, and, as a result, petitioners' conduct was an "unfair or deceptive act or practice" under the MUTPA. Me. Rev. Stat. Ann., Tit. 5, §207; 436 F. Supp. 2d, at 133.

Respondents' claims seek to impose liability on petitioners because of the effect that smoking light cigarettes had on their health. The alleged misrepresentation here—that "light" and "low-tar" cigarettes are not as healthy as advertised—is actionable *only* because of the effect that smoking light and low-tar cigarettes had on respondents' health. Otherwise, any alleged misrepresentation about the effect of the cigarettes on health would be immaterial for purposes of the MUTPA and would not be the source of the injuries that provided the impetus for the class-action lawsuit. See *State* v. *Weinschenk*, 2005 ME 28, ¶17, 868 A. 2d 200, 206 ("An act or practice is deceptive [under the MUTPA] if it is a *material* representation, omission, act or practice that is likely to mislead consumers acting reasonably under the circumstances" (emphasis added)). Therefore, with this suit, respondents seek to *require* the cigarette manufacturers to provide additional warnings about compensatory behavior, or to *prohibit* them from selling these products with the "light" or "low-tar" descriptors. This is exactly the type of lawsuit that is pre-empted by the Labeling Act. Cf. *Rowe*, 552 U. S., at ___ (slip op.,

at 6) (finding pre-emption of a Maine regulation of shipping of tobacco products where "[t]he Maine law . . . produces the very effect that the federal law sought to avoid").

Because the proper test for pre-emption is to look at the factual basis of a complaint to determine if a claim imposes a requirement based on smoking and health, there is no meaningful distinction to be drawn in this case between common-law failure-to-warn claims and claims under the MUTPA.[6] As the majority readily admits, both types of claims impose duties with respect to the same conduct—*i.e.,* the marketing of "light," "low-tar," and "low-nicotine" cigarettes. See *ante*, at 11, n. 9. If the claims arise from identical conduct, the claims impose the same requirement or prohibition with respect to that conduct. And when that allegedly wrongful conduct involves misleading statements about the health effects of smoking a particular brand of cigarette, the liability and resulting requirement or prohibition are, by definition, based on smoking and health.

Finally, at oral argument, respondents argued that their claims do not impose requirements based on smoking and health because the damages they seek to recover are not

_____

[6]The majority's observation that no warning-neutralization claim is at issue in this case, *ante*, at 11 n. 9, misses the point. The principal weakness in the *Cipollone* plurality's logic is not its distinction between claims for warning neutralization and claims for fraud. It is the fact that the predicate duty underlying New Jersey's products liability law, from which the majority now claims the warning-neutralization claim derived, see *ante,* at 11, n. 8, was no more specific to smoking and health than the predicate duty underlying the fraud claim, see *Cipollone*, 505 U. S., at 552–553 (opinion of SCALIA, J.) ("*Each* duty transcends the relationship between the cigarette companies and cigarette smokers; *neither* duty was specifically crafted with an eye toward 'smoking and health'"); *id.*, at 543 (opinion of Blackmun, J.); see also *supra,* at 16. Thus, the products-liability and the fraud claims must stand or fall together. The majority's refusal to address the logical inconsistency of its approach remains as glaring today as it was in *Cipollone.*

based on the effect of smoking on their health; rather, respondents are "asking . . . for the difference in value between a product [they] thought [they] were buying and a product [they] actually bought." Tr. of Oral Arg. 29. But the requirement or prohibition covered by §5(b) is created by the imposition of liability for particular conduct—here, the way in which petitioners marketed "light" and "low-tar," and "low-nicotine" cigarettes—not by the manner in which respondents have chosen to measure their damages. No matter how respondents characterize their damages claim, they have not been injured for purposes of the MUTPA, and thus cannot recover, unless their decision to purchase the cigarettes had a negative effect on their health.

In any event, respondents sought "such injunctive relief as may be appropriate" in this case. App. 42a. The MUTPA specifically authorizes "other equitable relief, including an injunction," to remedy unfair or deceptive trade practices. Me. Rev. Stat. Ann., Tit. 5, §213(1) (West 2002). And a court-crafted injunction prohibiting petitioners from marketing light cigarettes would be no less a requirement or prohibition than the regulations found to be pre-empted in *Reilly*. In the end, no matter what form the remedy takes, the liability with respect to the specific claim still creates the requirement or prohibition. When that liability is necessarily premised on the effects of smoking on health, as respondents' claims are here, the civil action is pre-empted by §5(b) of the Labeling Act.

## IV

The Court today elects to convert the *Cipollone* plurality opinion into binding law, notwithstanding its weakened doctrinal foundation, its atextual construction of the statute, and the lower courts' inability to apply its methodology. The resulting confusion about the nature of a claim's "predicate duty" and inevitable disagreement in

the lower courts as to what type of representations are "material" and "misleading" will have the perverse effect of increasing the nonuniformity of state regulation of cigarette advertising, the exact problem that Congress intended §5(b) to remedy. It may even force us to yet again revisit the Court's interpretation of the Labeling Act. Because I believe that respondents' claims are pre-empted under §5(b) of the Labeling Act, I respectfully dissent.