[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. CSX Transp., Inc.*, Slip Opinion No. 2022-Ohio-2832.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-2832

THE STATE OF OHIO, APPELLEE, *v.* CSX TRANSPORTATION, INC., APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. CSX Transp., Inc.*, Slip Opinion No. 2022-Ohio-2832.]

*Criminal law—R.C. 5589.21—Preemption—Interstate Commerce Commission Termination Act—Federal Railroad Safety Act—Judgment reversed and trial court's dismissal of all charges reinstated.*

(No. 2020-0608—Submitted April 28, 2021—Decided August 17, 2022.)

APPEAL from the Court of Appeals for Union County, Nos. 14-19-07 through 14-19-11, 2020-Ohio-2665.

_____

**KENNEDY, J., announcing the judgment of the court.**

{¶ 1} In this discretionary appeal from a judgment of the Third District Court of Appeals, we are asked whether R.C. 5589.21 is preempted by the Interstate Commerce Commission Termination Act (the "Termination Act"), 49 U.S.C.

10101 et seq., or the Federal Railroad Safety Act (the "Safety Act"), 49 U.S.C. 20101 et seq.

{¶ 2} With exceptions not applicable here, R.C. 5589.21 prohibits a stopped train from blocking a railroad crossing for more than five minutes; a violation of the statute is a first-degree misdemeanor, R.C. 5589.99. The General Assembly enacted this statute to enhance public safety by ensuring the unhindered flow of emergency responders across railroad crossings. R.C. 5589.20.

{¶ 3} The Termination Act created the Surface Transportation Board and grants the board exclusive jurisdiction over "transportation by rail carriers." 49 U.S.C. 10501. The Termination Act provides the exclusive remedies with respect to operating rules, practices, routes, services, and facilities of rail carriers and expressly preempts other federal and state laws in conflict with it. 49 U.S.C. 10501(b). Because R.C. 5589.21 regulates, manages, and governs rail traffic in this state by prescribing how long a train may stay stopped while blocking a crossing, it conflicts with and is expressly preempted by the Termination Act.

{¶ 4} The Safety Act provides a limited exception to the Termination Act's preemptive force, permitting the Secretary of Transportation and the states, where applicable, to regulate railroad safety. However, R.C. 5589.21 is a not a law related to railroad safety, because a limit on the amount of time that a train may occupy a crossing is not related to the safe operation of trains. Rather, "improper obstructions create uniquely different local safety problems by preventing the timely movement of ambulances, the vehicles of law enforcement officers and firefighters, and official and unofficial vehicles transporting health care officials and professionals." R.C. 5589.20. Although blocking a railroad crossing poses a threat to public safety, a statute prohibiting the blocking of a crossing does not fall under the federal Safety Act, because it does not affect the safety of railroad operations themselves or seek to reduce railroad-related accidents and incidents, *see* 49 U.S.C. 20101.

2

**{¶ 5}** In this case, the state charged appellant, CSX Transportation, Inc. ("CSX"), with violating R.C. 5589.21 on five occasions, but the trial court concluded that the Termination Act and the Safety Act preempted Ohio's antiblocking statute and dismissed the charges. The appellate court rejected the argument that federal law preempted R.C. 5589.21 and reversed the dismissal of the charges.

**{¶ 6}** However, because R.C. 5589.21 is preempted by federal law, we reverse the judgment of the Third District Court of Appeals and reinstate the trial court's dismissal of all the charges brought against CSX for violating R.C. 5589.21.

## I. Facts and Procedural History

**{¶ 7}** In 2018, the state charged CSX with violating R.C. 5589.21 five times in Union County. CSX moved to dismiss the charges on the grounds that the Termination Act and the Safety Act preempt R.C. 5589.21. In support of its motion, CSX presented the affidavit of Blair Johnson, whose job duties include overseeing personnel responsible for moving trains in and out of the Honda plant near Marysville. He explained that CSX regularly delivers goods and supplies to the plant and that CSX's trains occasionally block grade crossings while loading and unloading at the plant and while entering and exiting it. He also noted that one of the alleged violations of R.C. 5589.21 occurred because a train had to block a crossing to allow another train using the same track to pass.

**{¶ 8}** The trial court granted CSX's motion, relying on state and federal cases holding that blocked-crossing statutes are preempted by federal law.

**{¶ 9}** The Third District Court of Appeals reversed, explaining that

> it is our view that if any Ohio court is going to adopt and incorporate the judicial determination of other jurisdictions as the law of Ohio that under the [Termination Act], a railroad company has untrammeled discretion to block any rail crossing in any community

in the state for any purpose, for any amount of time, regardless of its reasons or operational necessity, and regardless of the jeopardy to the public health, safety and welfare of the citizens caused by that blocked crossing; and that any legislation enacted by the duly elected state legislature to address those specific public health, safety and welfare concerns in terms which even remotely appear designed to influence or dissuade the behavior of the railroad company at such a crossing, is null and *void ab initio*, then the court making that ruling should be the Supreme Court of Ohio.

2020-Ohio-2665, 154 N.E.3d 327, ¶ 32.

{¶ **10**} We accepted CSX's appeal to review two propositions of law:

1. R.C. 5589.21 is preempted by the ICC Termination Act.
2. R.C. 5589.21 is preempted by the Federal Railroad Safety Act.

*See* 159 Ohio St.3d 1486, 2020-Ohio-4232, 151 N.E.3d 635.

**II. Law and Analysis**

*A. Standard of Review*

{¶ **11**} Federal preemption is a question of law. *Merck Sharp & Dohme Corp. v. Albrecht*, ___ U.S. ___, 139 S.Ct. 1668, 1680, 203 L.Ed.2d 822 (2019). We review questions of law de novo. *State v. Codeluppi*, 139 Ohio St.3d 165, 2014-Ohio-1574, 10 N.E.3d 691, ¶ 9.

*B. Ohio's Antiblocking Statute*

{¶ **12**} R.C. 5589.21 provides:

(A)  No railroad company shall obstruct, or permit or cause to be obstructed a public street, road, or highway, by permitting a

4

railroad car, locomotive, or other obstruction to remain upon or across it for longer than five minutes, to the hindrance or inconvenience of travelers or a person passing along or upon such street, road, or highway.

(B)  At the end of each five minute period of obstruction of a public street, road, or highway, each railroad company shall cause such railroad car, locomotive, or other obstruction to be removed for sufficient time, not less than three minutes, to allow the passage of persons and vehicles waiting to cross.

(C)  This section does not apply to obstruction of a public street, road, or highway by a continuously moving through train or caused by circumstances wholly beyond the control of the railroad company, but does apply to other obstructions, including without limitation those caused by stopped trains and trains engaged in switching, loading, or unloading operations.

*C. Federal Preemption of State Law*

**{¶ 13}** The Supremacy Clause of the United States Constitution provides that the Constitution, federal statutes, and treaties constitute "the supreme Law of the Land."  U.S. Constitution, Article VI, cl. 2.  "It is well established that within constitutional limits Congress may preempt state authority by so stating in express terms."  *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm.*, 461 U.S. 190, 203, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983).

*D. The Interstate Commerce Commission Termination Act*

**{¶ 14}** The Termination Act abolished the Interstate Commerce Commission and created the Surface Transportation Board, 109 Stat. 803, to allow competitive rates for rail transportation, to minimize regulatory control, and to promote efficiency, without detriment to public health and safety, 49 U.S.C. 10101.

The Termination Act grants the board exclusive jurisdiction over "transportation by rail carriers" and sets forth remedies with respect to operating rules, practices, routes, services, and facilities of rail carriers. 49 U.S.C. 10501(b)(1). "Transportation" is broadly defined in the Act to include the movement of "a locomotive, car, * * * or equipment of any kind related to the movement of passengers or property, or both, by rail." 49 U.S.C. 10102(9)(A). The board also has exclusive jurisdiction over the "construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities." 49 U.S.C. 10501(b)(2). The Act states, "Except as otherwise provided in this part [49 U.S.C. 10101 et seq.], the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. 10501(b).

{¶ 15} When construing the Termination Act, we have explained that the board has "exclusive jurisdiction over all physical instrumentalities possessed and all services provided by rail carriers that are related to the movement of passengers and/or property. This broad, sweeping language shows Congress's intent to preempt any state effort to regulate rail transportation." *Girard v. Youngstown Belt Ry. Co.*, 134 Ohio St.3d 79, 2012-Ohio-5370, 979 N.E.2d 1273, ¶ 22. The Act displaces " ' "regulation," i.e., those state laws that may reasonably be said to have the effect of "manag[ing]" or "govern[ing]" rail transportation.' " *Id.* at ¶ 23, quoting *Florida E. Coast Ry. Co. v. W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir.2001), quoting *Black's Law Dictionary* 1286 (6th Ed.1990).

{¶ 16} R.C. 5589.21 directs a rail carrier to move a "railroad car, locomotive, or other obstruction"—i.e., equipment related to moving passengers or property by rail—after the car has stopped and blocked a railroad crossing for more than five minutes. It then prohibits a rail carrier from obstructing the crossing for three minutes, after which it may block the crossing again for another five minutes.

6

Consequently, it takes little effort to conclude that R.C. 5589.21 directly regulates rail transportation.

**{¶ 17}** Under R.C. 5589.99, blocking a railroad crossing with a stopped train for more than five minutes is a first-degree misdemeanor. R.C. 5589.21(C) provides exceptions from criminal liability for a continuously moving train and for stoppages that are beyond the rail carrier's control. No party asserts that either of these exceptions provide a defense to the charges brought against CSX, since the exceptions do not apply to "stopped trains and trains engaged in switching, loading, or unloading operations," *id.*, which is what occurred here. R.C. 5589.21 therefore regulates the movement of railroad equipment, an activity that Congress placed under the exclusive authority of the Surface Transportation Board.

**{¶ 18}** R.C. 5589.21 also provides a criminal remedy related to railroad practices and services, addressing the public-safety issues created by a train blocking a crossing during loading, unloading, or switching operations. But again, the Termination Act sets forth the exclusive remedies against rail carriers and preempts all state-law remedies brought against them. Further, the board, not the courts of this state, has exclusive jurisdiction over the remedies provided by the Termination Act.

**{¶ 19}** Because R.C. 5589.21 regulates how long a train may remain stopped across a railroad crossing for switching, loading, or unloading operations at an industrial customer's plant or to let another train pass, the statute usurps the exclusive jurisdiction of the board and therefore is preempted by the Termination Act. Compliance with the state statute in any practical way would force CSX to move its railroad lines and facilities so that a train may load, unload, or switch cars without blocking a crossing. However, the "construction, acquisition, operation, abandonment, or discontinuance" of railroad facilities are also matters committed to the board and are not subject to state regulation.

**{¶ 20}** This conclusion accords with the overwhelming weight of authority from other jurisdictions that have held that the Termination Act preempts state antiblocking laws like R.C. 5589.21. *E.g.*, *BNSF Ry. Co. v. Hiett,* 22 F.4th 1190, 1194 (10th Cir.2022); *Elam v. Kansas City S. Ry. Co*., 635 F.3d 796, 807 (5th Cir.2011); *State v. Norfolk S. Ry. Co.*, 107 N.E.3d 468, 477 (Ind.2018); *State v. BNSF Ry. Co.*, 56 Kan.App.2d 503, 513, 432 P.3d 77 (2018); *People v. Burlington N. Santa Fe RR.*, 209 Cal.App.4th 1513, 1531, 148 Cal.Rptr.3d 243 (2012); *Burlington N. & Santa Fe Ry. Co. v. Dept. of Transp.*, 227 Or.App. 468, 475, 206 P.3d 261 (2009); *Canadian Natl. Ry. Co. v. Des Plaines*, 1st Dist. No. 1-04-2479, 2006 WL 345095, *3 (Ill.Ct.App.2006); *Seattle v. Burlington N. RR. Co.*, 145 Wash.2d 661, 669, 41 P.3d 1169 (2002); *see also Delaware v. Surface Transp. Bd.*, 859 F.3d 16, 21-22 (2d Cir.2017) (statute prohibiting nonessential train idling at night in certain places preempted by the Termination Act); *Griffioen v. Cedar Rapids & Iowa City Ry. Co.*, 914 N.W.2d 273, 286 (Iowa 2018) ("laws, ordinances, and common-law damage actions challenging where and when railroads placed their railcars on their transportation lines * * * are generally preempted" by the Termination Act); *Anderson v. BNSF Ry. Co*., 375 Ark. 466, 475, 291 S.W.3d 586 (2009) (Termination Act preempts state proceeding to order rail carrier to reopen private crossing). As the Fifth Circuit Court of Appeals has explained, "[r]egulating the time a train can occupy a rail crossing impacts, in such areas as train speed, length and scheduling, the way a rail carrier operates its trains, with concomitant economic ramifications." *Friberg v. Kansas City S. Ry. Co.*, 267 F.3d 439, 444 (5th Cir.2001).

*E. The Federal Railroad Safety Act*

**{¶ 21}** The issue becomes, then, whether the Safety Act creates an exception to the Termination Act's preemption of state law or itself also preempts R.C. 5589.21.

**{¶ 22}** The Safety Act provides in part:

A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order—

(A) is necessary to eliminate or reduce an essentially local safety or security hazard;

(B) is not incompatible with a law, regulation, or order of the United States Government; and

(C) does not unreasonably burden interstate commerce.

49 U.S.C. 20106(a)(2).

**{¶ 23}** As applied to the circumstances of this case, the Termination Act and the Safety Act are in conflict. The Termination Act gives the board exclusive jurisdiction over transportation by rail, which includes railroad safety, and provides that "[e]xcept as otherwise provided in this part [Title 49, Subtitle IV, Part A], the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." The Safety Act, however, is codified in a different part of the United States Code—Title 49, Subtitle V, Part A—and provides for regulation and remedies related to railroad safety to be established by other entities, namely the Secretary of Transportation and the states. 49 U.S.C. 20106 et seq.

**{¶ 24}** As the United States Supreme Court has explained, "[w]hen confronted with two Acts of Congress allegedly touching on the same topic, this Court is not at 'liberty to pick and choose among congressional enactments' and must instead strive ' "to give effect to both." ' " *Epic Sys. Corp. v. Lewis*, ___ U.S. ___, ___, 138 S.Ct. 1612, 1624, 200 L.Ed.2d 889 (2018), quoting *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), quoting *United States v. Borden Co.,* 308 U.S. 188, 198, 60 S.Ct. 182, 84 L.Ed. 181 (1939). We may conclude that "two statutes cannot be harmonized, and that one displaces the other," only if there is " ' "a clearly expressed congressional intention" ' that such a result should follow." *Id.*, quoting *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995), quoting *Morton* at 551. We therefore presume that " 'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a later statute." *Id.*, *quoting United States v. Fausto*, 484 U.S. 439, 453, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988).

**{¶ 25}** "The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission. To eliminate the contradiction, the specific provision is construed as an exception to the general one." *RadLAX Gateway Hotel, L.L.C., v. Amalgamated Bank*, 566 U.S. 639, 645, 132 S.Ct. 2065, 182 L.Ed.2d 967 (2012). "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Morton* at 550-551.

**{¶ 26}** The Termination Act sets forth the federal policy for "regulating the railroad industry," 49 U.S.C. 10101; it is a general statute, overriding other state and federal laws regarding railroad transportation. On the other hand, the Safety Act specifically "promote[s] safety in every area of railroad operations," 49 U.S.C. 20101; it permits the Secretary of Transportation and the states, where applicable,

to regulate railroad safety. Therefore, if R.C. 5589.21 is a law related to railroad safety, then it is not preempted by the Termination Act, and it may—or may not—be preempted by the Safety Act.

{¶ 27} As the state argues in its brief, quoting *DeHahn v. CSX Transp., Inc.*, 925 N.E.2d 442 (Ind.App.2010), the Safety Act "is concerned with creating a 'safe roadbed for trains,' not covering the regulation of peripheral areas such as roadways." We agree.

{¶ 28} In enacting the Safety Act, Congress expressed its purpose: "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. 20101. Considering this purpose, it is manifest that when Congress excluded laws related to railroad safety from federal preemption, it intended to permit those laws that make it safer to operate a railroad or that prevent railroad accidents such as derailments and collisions with pedestrians and automobiles. In contrast, the General Assembly in R.C. 5589.20 expressed its determination that R.C. 5589.21 is needed to ensure the movement of emergency vehicles across the grade—an important matter of public safety, but not one of railroad safety. *Accord BNSF Ry. Co.*, 22 F.4th at 1196 (Oklahoma's antiblocking statute addresses "public safety issues—not rail safety issues"). Further, Ohio's prohibition on blocking a railroad crossing for more than five minutes disserves Congress's purpose of making railroad operations safer. For example, once a train blocks a crossing, it has five minutes or less to clear the crossing, which means the train might have to exceed federal speed limits to avoid committing a first-degree misdemeanor under Ohio law. *See* 49 C.F.R. 213.9. Similarly, obeying R.C. 5589.21 might require railroad employees to forgo federally mandated equipment checks, such as testing the airbrakes before moving the train. *See* 49 C.F.R. 232.215.

{¶ 29} Numerous courts have held that the Safety Act precludes state laws like R.C. 5589.21 because the requirements of antiblocking laws conflict with

federal regulations on speed, train length, crossing approach, and airbrake testing. *E.g.*, *CSX Transp., Inc. v. Plymouth*, 283 F.3d 812, 817 (6th Cir.2002); *Eagle Marine Industries, Inc. v. Union Pacific RR. Co.*, 227 Ill.2d 377, 380, 882 N.E.2d 522 (Ill.2008); *Krentz v. Consol. Rail Corp.*, 589 Pa. 576, 596-597, 910 A.2d 20 (2006); *Seattle*, 145 Wash.2d at 673, 41 P.3d 1169; *Weyauwega v. Wisconsin Cent. Ltd.*, 384 Wis.2d 382, 2018 WI App 65, 919 N.W.2d 609, ¶ 61.

{¶ 30} Nor is R.C. 5589.21 saved from preemption by the carve-out for stricter railroad-safety regulations aimed at "an essentially local safety or security hazard," 49 U.S.C. 20106(a)(2)(A). As the Eighth Circuit Court of Appeals has explained, "[t]he purpose of the savings clause is to 'enable the states to respond to local situations not capable of being adequately encompassed within the uniform national standards.' " *Duluth, Winnipeg & Pacific Ry. Co. v. Orr*, 529 F.3d 794, 796 (8th Cir.2008), quoting H.R.Rep. No. 91-1194, at 11 (1970), reprinted in 1970 U.S.C.C.A.N. 4104, 4117. However, "[i]f the local situation is actually statewide in character or capable of being adequately encompassed within national uniform standards, it will not be considered an essentially local safety hazard." (Emphasis deleted.) *Id.* at 798.

{¶ 31} R.C. 5589.21 does not address essentially local safety hazards. First, as explained above, R.C. 5589.21 is not a railroad-safety statute. Second, it is a statewide law that applies a blanket prohibition on blocking crossings regardless of the circumstances at individual crossings. Moreover, the public-safety concerns caused by a train blocking a railroad crossing for an extended time are capable of being served by national standards, but the Secretary of Transportation has chosen not to develop those standards. Therefore, neither of the savings clauses in 49 U.S.C. 20106(a)(2) apply to R.C. 5589.21.

{¶ 32} Consequently, the Termination Act preempts an antiblocking statute like R.C. 5589.21, and the Safety Act does not exempt R.C. 5589.21 from the

Termination Act's preemptive force. R.C. 5589.21 therefore may not be enforced against CSX.

### III. Conclusion

**{¶ 33}** We acknowledge the significant danger to the public that is created when stopped trains obstruct the movement of first responders across railroad tracks. However, the regulation of railroad transportation is a matter of federal law, and the federal government alone has the power to address the threat to public safety caused by blocked crossings. Because R.C. 5589.21 is preempted, it cannot be enforced against CSX. The trial court correctly dismissed the charges in this case.

**{¶ 34}** For these reasons, we reverse the judgment of the Third District Court of Appeals, and we reinstate the trial court's dismissal of all charges brought against CSX for violating R.C. 5589.21.

Judgment reversed.

DeWINE, J., concurs.

FISCHER, J., concurs in judgment only, with an opinion joined by O'CONNOR, C.J.

STEWART, J., concurs in judgment only.

BRUNNER, J., dissents, with an opinion joined by DONNELLY, J.

_____

**FISCHER, J., concurring in judgment only.**

**{¶ 35}** To reduce safety hazards created by stopped trains at railroad crossings, the General Assembly laudably enacted R.C. 5589.21. The statute places limits on the length of time that a train may be parked across a public grade crossing. While I am wholly sympathetic to the General Assembly's goal to improve public safety, I cannot disregard the law of federal preemption. The General Assembly's antiblocking statute is federally preempted by the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. 20101 et seq. Because the lead opinion

states that the statute is preempted on different grounds, I must respectfully concur in judgment only.

**Federal Preemption**

**{¶ 36}** Federal preemption is derived from the Supremacy Clause of the United States Constitution. U.S. Constitution, Article VI, cl. 2; *State ex rel. Yost v. Volkswagen Aktiengesellschaft*, 165 Ohio St.3d 213, 2021-Ohio-2121, 177 N.E.3d 242, ¶ 10. And pursuant to the Supremacy Clause, the United States Congress has the power to preempt state law. *Volkswagen* at ¶ 11.

**{¶ 37}** Federal preemption is fundamentally a question of congressional intent, *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), and may be either expressed or implied, *Gade v. Natl. Solid Wastes Mgt. Assn.*, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992).

**{¶ 38}** Congress enacted the FRSA "to promote safety in *every area* of railroad operations *and* reduce railroad-related accidents and incidents." (Emphasis added.) 49 U.S.C. 20101. The goal was to create nationally uniform "[l]aws, regulations, and orders *related to* railroad safety." (Emphasis added.) 49 U.S.C. 20106(a)(1). Congress included an express preemption clause in the FRSA as well as two safe-harbor provisions. Under the first safe-harbor provision, states are permitted to "adopt or continue in force a law, regulation, or order related to railroad safety * * * until the Secretary of Transportation (with respect to railroad safety matters) * * * prescribes a regulation or issues an order covering the *subject matter* of the State requirement." (Emphasis added.) 49 U.S.C. 20106(a)(2). And under the second safe-harbor provision, states may adopt or continue to enforce a more stringent law, regulation, or order related to railroad safety when it (1) is "necessary to eliminate or reduce an essentially local safety or security hazard," (2) is not incompatible with federal law, and (3) does not unreasonably burden interstate commerce. 49 U.S.C. 20106(a)(2).

14

**{¶ 39}** Here, the lead opinion maintains that the FRSA does not apply because R.C. 5589.21 is an antiblocking statute, not a railroad safety statute. But R.C. 5589.21 is more than simply an antiblocking statute; it is a safety measure that promotes public safety *and* seeks to prevent any hindrance or inconvenience of travel for the public and for emergency responders relating to blocked railroads.

**{¶ 40}** The General Assembly found that "the improper obstruction of railroad grade crossings by trains is a direct threat to the health, safety, and welfare of the citizens of this state *inasmuch* as improper obstructions create uniquely different local safety problems" for emergency responders. (Emphasis added.) R.C. 5589.20. It thus enacted R.C. 5589.21.

**{¶ 41}** The language in R.C. 5589.20 indicates that R.C. 5589.21 necessarily considers public-safety issues beyond quick responses to emergency situations and considers the safety of the public, including those related to railroad-safety issues. This conclusion is further supported by the fact that any fine collected for a violation of R.C. 5589.21 is paid to a fund for the improvement of railroad grade crossings in the county or the municipal corporation in which the violation had occurred. R.C. 5589.24. This shows the General Assembly's intent in enacting R.C. 5589.21 was to promote the safety of the public at railroad grade crossings.

**{¶ 42}** Therefore, reading R.C. 5589.21 in light of R.C. 5589.20 and 5589.24, it is clear that R.C. 5589.21 is designed to protect citizens from railroad-related accidents or incidents and that it is a safety statute that falls under the FRSA. Thus, this court must look to see whether other federal laws regulate safety at grade crossings.

**{¶ 43}** The FRSA and regulations implemented by the Federal Railroad Administration ("FRA") specifically refer to matters related to safety at grade crossings. Under the FRSA, "the Secretary of Transportation shall maintain a coordinated effort to develop and carry out solutions to the railroad grade crossing problem and measures to protect pedestrians in densely populated areas along

railroad rights of way." 49 U.S.C. 20134(a). To carry out this duty, the secretary of transportation may use his authority regarding traffic, highway, and vehicle safety. *Id.*

**{¶ 44}** Related to this provision, the FRA requires ten states, including Ohio, to "develop and submit to FRA for review and approval an updated State highway-rail grade crossing action plan" to address safety risks. 49 C.F.R. 234.11(c). The purpose of the requirement is "to reduce accident/incidents at highway-rail and pathway grade crossings nationwide" by requiring states to develop or update the states' action plans and to implement them. 49 C.F.R. 234.11(a).

**{¶ 45}** While the primary purpose of R.C. 5589.21 is more specific than those purposes in the FRSA statutory provisions and the federal regulations, we must acknowledge that trains that are blocking an intersection for a length of time are necessarily included in the broad subject matter of grade-crossing safety. Therefore, R.C. 5589.21 cannot fall within the first safe harbor and is preempted.

**{¶ 46}** Additionally, in 49 C.F.R. 213.9(a), the FRA has dictated maximum operating speed limits for trains. This regulation "should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions imposed by grade crossings." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 675, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). The time limitation in R.C. 5589.21 will necessarily affect train speed. The primary purpose of the regulation is irrelevant—the only issue is whether regulations have been adopted that cover the subject matter. *Easterwood* at 675. Thus, R.C. 5589.21 regulates a second subject matter that is covered by federal law, *see CSX Transp., Inc. v. Plymouth*, 283 F.3d 812, 817 (6th Cir.2002), and is further support for the conclusions that R.C. 5589.21 is preempted and that it does not fall within the first safe harbor.

**{¶ 47}** The state also cannot meet the requirements of the second safe harbor, because R.C. 5589.21 is incompatible with federal law. The FRSA's use of the term "federal law" is broad. "Federal law" does not mean simply that the state's law is incompatible with the FRSA; it refers to a state law's incompatibility with other federal law as well. This includes the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), 49 U.S.C. 10101 et seq.

**{¶ 48}** As correctly stated by the lead opinion, the General Assembly's restriction on how long a train may be stopped on tracks usurps the exclusive jurisdiction of the Surface Transportation Board ("STB") and interferes with the regulations in place involving switching, operations, and routes. *See Girard v. Youngstown Belt Ry. Co.*, 134 Ohio St.3d 79, 2012-Ohio-5370, 979 N.E.2d 1273, ¶ 18 (STB has exclusive jurisdiction over certain aspects of interstate rail activity); *Seattle v. Burlington N. RR. Co.*, 145 Wash.2d 661, 667, 41 P.3d 1169 (2002) (antiblocking statute was preempted by ICCTA because it attempted to regulate switching activities). Therefore, the Ohio statute is incompatible with federal law and is preempted by the FRSA. *See Mundelein v. Wisconsin Cent. RR.*, 227 Ill.2d 281, 299, 882 N.E.2d 544 (2008).

### Conclusion

**{¶ 49}** Unfortunately, R.C. 5589.21 is preempted by federal law. Other states that have decided similar issues of preemption have reached the same conclusion. Although I personally think the applicable federal law does not adequately protect the public, my hands are tied.

**{¶ 50}** Additionally, I encourage our General Assembly to work with Ohio's senators and representatives in Congress to resolve issues related to trains blocking public grade crossings. This issue is one of great importance, as shown by an abundance of case law from numerous jurisdictions. We would all benefit from additional guidance that encourages safety and uniformity in all jurisdictions.

{¶ 51} Because I find that R.C. 5589.21 is preempted under the FRSA, I respectfully concur in judgment only.

O'CONNOR, C.J., concurs in the foregoing opinion.

_____

**BRUNNER, J., dissenting.**

## I. INTRODUCTION

{¶ 52} This case addresses whether federal law preempts R.C. 5589.21, a state law that limits the length of time a train may be parked across a public grade crossing. In this case, two opinions, each concurred in by only one other justice, decide that this statute, which has existed in one form or another for more than 150 years, is preempted. But these opinions reach their conclusions without agreeing between them why, or by what act, the Ohio statute is preempted. And this occurs even though R.C. 5589.21 is a safety statute aimed at regulating railroads and even though federal law permits states to regulate any subject matter related to railroad safety that federal law has not yet regulated. Moreover, these opinions reach their conclusions even though all seven justices of this court agree that no federal law exists to regulate blocked railroad crossings.

{¶ 53} Justice Kennedy's opinion concludes that R.C. 5589.21, which explicitly addresses safety and railroads, is nonetheless not about railroad safety. She concludes that the statute may not to be analyzed under the federal law that provides a safe harbor from preemption for state laws regulating subject matter that federal law does not regulate. That opinion also notes with approval that several other courts (many of them federal) have decided that blocked-crossing statutes are preempted by federal law. Justice Fischer's opinion concludes, and I agree, that R.C. 5589.21 is about railroad safety and that it is properly analyzed under the federal regulation that contains a preemption safe harbor. However, Justice Fischer's opinion concludes that even though the federal government has not regulated blocked crossings, because it has regulated other subject matter

18

addressing the safety of grade crossings, Ohio's blocked-crossing statute is preempted. I disagree.

{¶ 54} Under a plain reading, a statute that is about safety and railroads is about railroad safety. Since the federal government has not acted to protect citizens from the effects of railroad cars that block crossings, nor granted impunity for the blocking of crossings, the Ohio legislature is permitted to enact laws to protect the safety of Ohio citizens in this scenario. While other jurisdictions hold that their grade-crossing laws are preempted by federal law despite a lack of federal regulation on that subject matter, those nonbinding precedents do not deprive Ohioans of the protections afforded by the Ohio General Assembly. I therefore respectfully dissent.

## II. FACTS AND PROCEDURAL HISTORY

{¶ 55} Justice Kennedy's statement of the facts of this case need not be repeated in this dissent; they are straightforward and not at issue. This is not a mere technical or close-call violation of the statute with which CSX has been charged. Each instance in which CSX was charged involved blocking the crossing in question with a stopped train for much longer than the statutorily permitted period. In Marysville Municipal Court case No. 18CRB440, the state alleged that a stationary CSX train had blocked the intersection of Paver Barnes Road at Shirk Road for at least one hour. In Marysville Municipal Court case No. 18CRB509, the state alleged that a stationary CSX train had blocked the intersection of Bear Swamp Road at Benton Road for at least one hour. In Marysville Municipal Court case No. 18CRB606, the state alleged that a CSX train had blocked Warner Road in Jerome Township for more than one hour. In Marysville Municipal Court case No. 18CRB924, the state alleged that a CSX train had blocked Bear Swamp Road near the intersection of Benton Road for approximately 45 minutes. Finally, in Marysville Municipal Court case No. 18CRB1048, the state alleged that a CSX train had blocked a crossing on State Route 739 near the intersection of Bear

Swamp Road for more than one hour. The charging affidavit in that case also cited an instance when Liberty West Road was simultaneously blocked by a stationary CSX train.

**{¶ 56}** As related in Justice Kennedy's opinion, CSX moved to dismiss all the charges. That motion was granted, and the state appealed. The Third District Court of Appeals reversed the judgments and essentially referred the matter to this court for final determination. 2020-Ohio-2665, 154 N.E.3d 327, ¶ 31-32.

## III.  DISCUSSION

**{¶ 57}** The legal principle of federal preemption finds its roots in the United States Constitution, which provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Constitution, Article VI, cl. 2. In accordance with that statement, the United States Supreme Court has held that state laws that conflict with federal laws are without effect. *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." *Altria Group, Inc. v. Good*, 555 U.S. 70, 76, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008). It is difficult to imply federal preemption because there is a presumption against preemption. *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654-655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). Nevertheless, when a federal statute contains an express preemption clause, there is no need to apply the general presumption against preemption: instead, the federal statutory language is

simply applied. *Puerto Rico v. Franklin California Tax-Free Trust*, ___ U.S. ___, ___, 136 S.Ct. 1938, 1946, 195 L.Ed.2d 298 (2016). But "[i]f a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Altria Group* at 76. This is because "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.' " *Id.* at 77, quoting *Bates v. Dow Agrosciences, L.L.C.*, 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005). This general statement relies on the principle that the " 'historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " (Brackets added in *Altria.) Id.*, quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). And the converse is also true. Generally, "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000).

{¶ 58} Railroads historically have been and still are federally regulated due to their inherently interstate nature. *See, e.g.*, Act of Mar. 2, 1893, ch. 196, 27 Stat. 531 ("An act to promote the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes and their locomotives with driving-wheel brakes, and for other purposes"); Act to Regulate Commerce, ch. 104, 24 Stat. 379 (1887) (regulating interstate commerce and creating the Inter-State Commerce Commission); *California v. Cent. Pacific RR. Co.*, 127 U.S. 1, 39-40, 8 S.Ct. 1073, 32 L.Ed. 150 (1888) (noting Congress's broad use of commerce-clause powers to create and regulate a vast system of railroads connecting the eastern United States with the Pacific). Yet, Ohio and other states have long exercised some degree of police power over crossings. *Capelle v. Baltimore & Ohio RR. Co.*,

136 Ohio St. 203, 208, 24 N.E.2d 822 (1940) (noting blocked-crossing statutes in Ohio as early as 1853). Under these circumstances, when confronting an issue that implicates both a long history of a state's exercise of police powers (regulation of grade crossings) and a long history of federal regulations (regulation of railroads generally) it is most appropriate to simply apply the text of the relevant statutes without any presumption. *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 665, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (noting that application of the explicit preemption language in the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. 20101 et seq., with safe harbors, incorporates the requisite solicitude toward states' rights created by the presumption against preemption); *but see State v. Norfolk S. Ry. Co.*, 107 N.E.3d 468, 472-473 (Ind.2018) (applying the presumption against preemption regarding state blocked-crossing legislation, finding that the state's long history of exercising police power in regard to railroad crossings justified application of that presumption).

{¶ 59} R.C. 5589.21 provides:

> (A) No railroad company shall obstruct, or permit or cause to be obstructed a public street, road, or highway, by permitting a railroad car, locomotive, or other obstruction to remain upon or across it for longer than five minutes, to the hindrance or inconvenience of travelers or a person passing along or upon such street, road, or highway.

> (B) At the end of each five minute period of obstruction of a public street, road, or highway, each railroad company shall cause such railroad car, locomotive, or other obstruction to be removed for sufficient time, not less than three minutes, to allow the passage of persons and vehicles waiting to cross.

22

(C)  This section does not apply to obstruction of a public street, road, or highway by a continuously moving through train or caused by circumstances wholly beyond the control of the railroad company, but does apply to other obstructions, including without limitation those caused by stopped trains and trains engaged in switching, loading, or unloading operations.

CSX argues that two federal statutory schemes preempt this Ohio law.  Justice Kennedy finds that one scheme, the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. 10101 et seq., preempts R.C. 5589.21.  Justice Fischer, however, finds that the other scheme, the FRSA, 49 U.S.C. 20101 et seq., preempts R.C. 5589.21.

### A.  Whether the FRSA or the ICCTA Is Applicable

{¶ 60} The FRSA is one of several federal railroad-safety laws that have been enacted from the late 19th century to the present.  Charles McDonald, *Federal Railroad Safety Program: 100 Years of Safer Railroads* (1993), available at https://www.hsdl.org/?abstract&did=15698 (accessed Aug. 10, 2022) [https://perma.cc/Z2MY-D9ZE].  The FRSA states explicitly that it preempts state law, as follows:

(1)  Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable.

(2)  A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the

subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order—

(A) is necessary to eliminate or reduce an essentially local safety or security hazard;

(B) is not incompatible with a law, regulation, or order of the United States Government; and

(C) does not unreasonably burden interstate commerce.

**{¶ 61}** The ICCTA also states explicitly that it preempts state law, but in this way:

(b) The jurisdiction of the [Surface Transportation] Board over—

(1) transportation by rail carriers, and the remedies provided in this part [49 U.S.C. 10101 et seq.] with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. 10501. "Transportation" is defined broadly to include "equipment of any kind related to the movement of passengers or property, or both, by rail" and "services related to that movement, including receipt, delivery, * * * and interchange of passengers and property." 49 U.S.C. 10102(9)(A) and (B).

{¶ 62} Although the ICCTA's preemption provisions are broadly worded, the United States Sixth Circuit Court of Appeals (with the benefit of amicus briefing from the implementing agency, the Surface Transportation Board) held that the ICCTA and the FRSA must be read in pari materia and that federal preemption of state laws regarding railroad safety falls under the FRSA's preemption provision, 49 U.S.C. 20106(a). *Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 522-523 (6th Cir.2001). That court explained:

> [T]he district court did not have the benefit of federal agency input regarding the jurisdictional relationship between the ICCTA and FRSA. As a result of this critical handicap, it did not achieve a "reasoned understanding of the way in which Congress intended the [ICCTA] and its surrounding regulatory scheme" to affect FRSA and its regulations. [*Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)]. Rather, the district court's decision erroneously preempts state rail safety law that is saved under FRSA if it tangentially touches upon an economic area regulated under the ICCTA. * * *
>
> While the [Surface Transportation Board] must adhere to federal policies encouraging "safe and suitable working conditions in the railroad industry," the ICCTA and its legislative history contain no evidence that Congress intended for the [Surface Transportation Board] to supplant the [Federal Railroad Administration]'s authority over rail safety. 49 U.S.C. § 10101(11).

> Rather, the agencies' complementary exercise of their statutory authority accurately reflects Congress's intent for the ICCTA and FRSA to be construed *in pari materia*. For example, while recognizing their joint responsibility for promoting rail safety in their 1998 Safety Integration Plan rulemaking, the [Federal Railroad Administration] exercised primary authority over rail safety matters under 49 U.S.C. § 20101 *et seq.*, while the [Surface Transportation Board] handled economic regulation and environmental impact assessment.

(Second set of brackets added in *Tyrrell.*) *Tyrrell* at 522-523. In stating this, the Sixth Circuit rejected a broad textual interpretation of the ICCTA of the sort advanced by CSX in this case, because such an interpretation of the ICCTA would "implicitly repeal[] FRSA's first saving clause." *Id.* at 523. Thus, the federal court, in analyzing federal law, accepted the plaintiff's argument that when a state statute is "one dealing with rail safety, [it] requir[es] analysis under the FRSA's preemption provision." *Id.* at 521.

{¶ 63} In short, the ICCTA is not to be so broadly applied as to implicitly repeal the FRSA. By its terms, the FRSA preempts only laws, regulations, and orders "related to railroad safety" and railroad security. 49 U.S.C. 20106(a). And while the ICCTA may preempt laws bearing on other railroad-related topics, state-enacted laws related to railroad safety and security are preempted, if at all, by the FRSA. *Tyrrell* at 523; *see also Island Park, L.L.C., v. CSX Transp.*, 559 F.3d 96, 107 (2d Cir.2009) ("FRSA provides the appropriate basis for analyzing whether a state law, regulation or order affecting rail safety is pre-empted by federal law"); *Boston & Maine Corp. v. Surface Transp. Bd.*, 364 F.3d 318, 321 (D.C.Cir.2004) ("primary jurisdiction over railroad safety belongs to the [Federal Railroad Administration], not the [Surface Transportation Board]"); *Iowa, Chicago & E. RR.*

*Corp. v. Washington Cty.*, 384 F.3d 557, 560 (8th Cir.2004) ("arguing that 'rail safety' for purposes of FRSA preemption does not include the highway safety risks created at rail crossings [is a] cramped reading of the FRSA [that] is inconsistent with 49 U.S.C. § 20134(a), with the federal rail crossing regulations discussed in *Easterwood*, and with common sense"). All three opinions in this case appear to agree that because R.C. 5589.21 is a railroad-safety statute, the FRSA is appropriately considered as a source of potential preemption.

{¶ 64} A paramount question is whether R.C. 5589.21 is a railroad-safety law. The text of R.C. 5589.21 does not use the word "safety," railroad or otherwise. It addresses "the hindrance or inconvenience of travelers or a person passing along or upon such street, road, or highway." R.C. 5589.21(A). However, the General Assembly amended R.C. 5589.21 in 2000 Am.Sub.S.B. No. 207, 148 Ohio Laws, Part V, 10849 ("S.B. 207"), when it enacted R.C. 5589.20, which states:

> The general assembly finds that the improper obstruction of railroad grade crossings by trains is a direct threat to the health, safety, and welfare of the citizens of this state inasmuch as improper obstructions create uniquely different local safety problems by preventing the timely movement of ambulances, the vehicles of law enforcement officers and firefighters, and official and unofficial vehicles transporting health care officials and professionals. *It is the intent of the general assembly in amending sections 5589.21, 5589.24, and 5589.99 of the Revised Code that the health, safety, and welfare of the citizens of this state be enhanced through those amendments*.

(Emphasis added.) This statement of intent specifically refers to the amendment of R.C. 5589.21 as expressly related to public safety, and it indicates that obstructions

of grade crossings create local safety problems by preventing the movement of first responders' and other officials' vehicles. I therefore would hold, in agreement with the opinion authored by Justice Fischer and joined by one other justice, that R.C. 5589.21 is a state law providing for the safety of Ohioans in regard to railroad crossings.

{¶ 65} CSX orally argued that R.C. 5589.21 is directed to local safety, not "railroad safety," narrowing its focus, for example, to keeping railway workers and passengers safe. This conclusion seems to have been adopted by Justice Kennedy's opinion. But FRSA defines railroad safety broadly: "The purpose of this chapter is to promote safety in *every* area of railroad operations and reduce railroad-related accidents and incidents." (Emphasis added.) 49 U.S.C. 20101. R.C. 5589.21 is expressly aimed at preventing railroad operations from causing incidents that risk the safety of those who cross the rails and the ability of first responders and other safety workers to keep others safe. Grade-crossing safety (though not blocking, particularly) is, moreover, directly contemplated by the FRSA, in 49 U.S.C. 20134 and regulations created thereunder, including 49 C.F.R. 234.105, 234.106, 234.107, and 234.209. R.C. 5589.21 is a safety statute and its direct and only subject is the railroads. I would hold, consistently with Justice Fischer's opinion, that R.C. 5589.21 is a railroad-safety statute and, thus, that the FRSA, and not the ICCTA, applies.

{¶ 66} CSX and Justice Kennedy's opinion rely on a number of cases for the proposition that the ICCTA preempts blocked-crossing statutes in general and R.C. 5589.21 in particular. However, these cases are neither binding nor persuasive. For example, in considering a blocked-crossing statute in the context of a claim of negligence per se based on a violation of a statute, the United States Court of Appeals for the Fifth Circuit concluded that the ICCTA preempted the claim. *Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 806-808 (5th Cir.2011). It reasoned that the ICCTA was aimed primarily at preempting the states' attempts to

economically manage or govern railroading. *Id.* at 804-806. Then the Fifth Circuit concluded that Mississippi's blocked-crossing statute, as a per se source of liability, was the state's attempt to implicitly regulate train length, speed, and scheduling, all of which amounted to economic management or governance of railroading throughout the state and thus was preempted by the ICCTA. *Id.* at 807-808.

**{¶ 67}** However, *Elam* and decisions like it evince little consideration of the FRSA. *See Ezell v. Kansas City S. Ry. Co.*, 866 F.3d 294, 300 (5th Cir.2017) (dismissing the FRSA in one paragraph); *Elam* at 808 (dismissing the FRSA in one paragraph); *Franks Invest. Co., L.L.C. v. Union Pacific RR. Co.*, 593 F.3d 404 (5th Cir.2010) (not mentioning the FRSA at all); *Friberg v. Kansas City S. Ry. Co.*, 267 F.3d 439, 444 (5th Cir.2001), fn.18 (refusing to consider the FRSA); *Norfolk S. Ry. Co.*, 107 N.E.3d at 478 (declining to consider the FRSA); *State v. BNSF Ry. Co.*, 56 Kan.App.2d 503, 517-518, 432 P.3d 77 (2018) (declining to consider the FRSA); *Burlington N. & Santa Fe Ry. Co. v. Dept. of Transp.*, 227 Or.App. 468, 471, 206 P.3d 261 (2009), fn.2 (mentioning the FRSA in a footnote with little analysis).

**{¶ 68}** The Fifth Circuit obliquely acknowledged the viability of the approach that I take in this dissent when it explicitly declined to consider the FRSA or "what impact the ICCTA would have upon a state provision pertaining strictly to such *traditionally state-controlled safety issues as local law enforcement and emergency vehicle access*." (Emphasis added.) *Friberg* at 444, fn.18. Several courts have followed the Fifth Circuit's approach on this issue when not according full consideration to the FRSA. *See BNSF Ry. Co. v. Edmond*, 504 F.Supp.3d 1249, 1258-1260 (W.D.Okla.2020) (collecting cases). The United States District Court for the Northern District of Ohio expressly joined the Fifth District's approach when considering R.C. 5589.21 in *CSX Transp., Inc. v. Williams*, N.D.Ohio No. 3:16CV2242, 2017 U.S. Dist. LEXIS 64959 (Apr. 28, 2017). However, the city's law director, the defendant in *Williams*, not only did not oppose CSX's arguments that federal law preempted R.C. 5589.21, he joined them, noting that he had advised

and warned municipal officials that "federal law indeed preempts the blocked-crossing law." *Id*. at *6. Thus, *Williams* is not a case in which the adversarial process functioned to produce a reliable result—it is a case in which the district court, having no alternative guidance, essentially adopted CSX's position, which was not disputed by the parties.

{¶ 69} There are cases (though they are few) in which courts have robustly analyzed both the ICCTA and the FRSA and concluded that one or both preempted state blocked-crossing statutes. For example, in *People v. Burlington N. Santa Fe RR.*, 209 Cal.App.4th 1513, 148 Cal.Rptr. 243 (2012), a California court of appeals concluded that the ICCTA, rather than the FRSA, was the appropriate federal law to consider when a railroad had been fined for blocking a crossing, *id.* at 1522-1528. However, it reached that conclusion by inserting the word "primarily" into the statutory-purpose analysis to evade the safety implications of the blocked-crossing statute at issue. *Id.* at 1524. I find that case to be unpersuasive, especially considering the explicit safety considerations iterated by the Ohio General Assembly in S.B. 207 and set forth in R.C. 5589.20.

{¶ 70} In short, R.C. 5589.21, which is especially referenced in R.C. 5589.20, is a safety statute. Its direct and only target is railroad operations. The FRSA, and not the ICCTA, is the vehicle for the preemptive analysis that should be applied to R.C. 5589.21.

### B. Whether the FRSA Preempts R.C. 5589.21

{¶ 71} As a safety statute then, the question remains: Does R.C. 5589.21 fit within either of the two safe harbors of the FRSA to avoid federal preemption? According to 49 U.S.C. 20106(a)(2), these two distinct safe harbors are

> [1.] *A State may adopt or continue in force a law*, regulation, or order related to railroad safety or security *until the Secretary of Transportation* (with respect to railroad safety matters), or the

Secretary of Homeland Security (with respect to railroad security matters), *prescribes a regulation or issues an order covering the subject matter of the State requirement*.

and

[2.] A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order—

(A) is necessary to eliminate or reduce an essentially local safety or security hazard;

(B) is not incompatible with a law, regulation, or order of the United States Government; and

(C) does not unreasonably burden interstate commerce.

(Emphasis added.)

{¶ 72} Under the first safe harbor, the FRSA would preempt R.C. 5589.21 if the secretary of transportation were to prescribe a regulation or issue an order covering the subject matter of blocked crossings. "[P]re-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." *Easterwood*, 507 U.S. at 664, 113 S.Ct. 1732, 123 L.Ed.2d 387. The parties, the trial court, and the three opinions in this case appear to agree that there is no federal regulation or order directly covering the topic of blocked crossings.

{¶ 73} The most analogous regulation that the parties cite, or which research reveals, is 49 C.F.R. 234.209, which prohibits railroads, "without first taking measures to provide for safety of highway traffic," from permitting trains to stand within a grade-crossing warning system's approach circuit, "other than normal train movements or switching operations, where the warning system is not

designed to accommodate those activities." However, this section, when read in its entirety and in the context of related regulations, is a maintenance regulation directing that warning systems are not to be interfered with unless alternative traffic-control measures are in place. And because "normal train movements or switching operations" are exempted, the regulation does not control when trains block crossings under ordinary conditions. In the absence of federal regulation substantially subsuming the subject matter of blocked crossings, R.C. 5589.21 does fall under the safe harbor contemplated in 49 U.S.C. 20106(a)(2), and Ohio "may adopt or continue in force a law, regulation, or order related to railroad safety * * * until the Secretary of Transportation * * * prescribes a regulation or issues an order covering the subject matter of the State requirement."[1]

{¶ 74} I recognize that many of the courts that have considered the matter have differed with this analysis and instead accepted the view that blocking statutes implicitly regulate train speed, length, and safety checks. *See, e.g.*, *Mundelein v. Wisconsin Cent. RR.*, 227 Ill.2d 281, 882 N.E.2d 544 (2008) (collecting cases); *Krentz v. Consol. Rail Corp.*, 589 Pa. 576, 910 A.2d 20 (2006); *CSX Transp., Inc. v. Plymouth*, 283 F.3d 812, 816-817 (6th Cir.2002); *Seattle v. Burlington N. RR. Co.*, 145 Wash.2d 661, 673, 41 P.3d 1169 (Wash.2002). These decisions address broad implicit concepts of the nature of blocking statutes. They reach the conclusions that such laws are not saved by the first safe harbor, because there are federal regulations governing train speed and safety checks (such as brakes). *See* 49 C.F.R. 213.9 (speed limits); 49 C.F.R. Part 232 (brake requirements). In these instances, federal regulation of train speed and safety checks are found to have substantially subsumed the subject matter of blocked crossings because, in effect,

---

1. I also note, but do not specifically analyze in this case, that under the second safe harbor, Ohio may "adopt or continue in force" an additional or more stringent law related to railroad safety when the law is "necessary to eliminate or reduce an essentially local safety or security hazard," is not incompatible with federal law, and does not unreasonably burden interstate commerce. 49 U.S.C. 20106(a)(2).

they control how long a train will linger across a grade crossing. This reasoning is apparent in the opinion authored by Justice Fischer.

{¶ 75} However, I view this differently. Holding that speed and safety checks impliedly subsume the subject matter of blocked crossings because blocked-crossing legislation is impliedly related to speed and safety checks does not take into account the plain fact that R.C. 5589.21 does not in any manner address speed, length, or safety checks. R.C. 5589.21 states only that a train (however long or short, slow or fast, safe or not) cannot (without valid reason) be stopped across a grade crossing for longer than five minutes. Thus, R.C. 5589.21(C) applies only to trains that are stopped.[2] Under R.C. 5589.21, CSX may still operate a train of any length or at any speed and conduct all required safety checks—it just cannot stop across a road for too long. I note that R.C. 5589.21(C) also provides a valid excuse when the stoppage is "caused by circumstances wholly beyond the control of the railroad company." If a federal law or regulation either directly or implicitly required CSX to block a crossing for a prohibited amount of time (a proposition CSX suggested in oral argument but never clearly explained in its brief), the Ohio statute might not apply, because that would likely be a circumstance beyond CSX's control. But that has not been shown in the record of this appeal. For these reasons, I would hold that the Ohio statute does not conflict with or regulate the same subject matter as existing federal law and accordingly, that R.C. 5589.21 is not preempted by federal law.

---

2. Though the statute also applies to "switching" operations, as the term is used, "switching" means the process of sorting items of rolling stock into complete trains or the reverse. *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 689, 131 S.Ct. 2630, 180 L.Ed.2d 637 (2011) ("switching" is the name for a process involving frequent starts and stops to add and remove individual rail cars). In *United States v. Seaboard Air Line RR. Co.*, 361 U.S. 78, 80 S.Ct. 12, 4 L.Ed.2d 25 (1959), the Supreme Court noted that it had previously recognized that " 'switching operations' were not 'train' movements within the meaning of [a federal railroad] Act," *id.* at 80, quoting *United States v. Erie RR. Co.*, 237 U.S. 402, 408, 35 S.Ct. 621, 59 L.Ed. 1019 (1915), and that " 'switching [is] classifying and assembling cars within railroad yards for the purpose of making up trains,' " *id.* at 81, quoting *United States v. N. Pacific Ry. Co.*, 254 U.S. 251, 254-255, 41 S.Ct. 102, 65 L.Ed. 249 (1920).

**{¶ 76}** Finally, some Ohio court decisions that note the failure of the federal authorities to legislate railroad safety have held that R.C. 5589.21 is within the safe harbor provided by the FRSA. *See State v. Wheeling & Lake Erie Ry. Co.*, 139 Ohio App.3d 271, 273-274, 743 N.E.2d 513 (9th Dist.2000); *State v. Chessie Sys. RR.*, 9th Dist. Wayne No. 2494, 1990 Ohio App. LEXIS 24, *4-7 (Jan. 3, 1990). While I would not fully embrace the rationales adopted in these various cases, I would reach the same conclusions using the rationale set forth in this opinion.

## IV. CONCLUSION

**{¶ 77}** In my view, as the law exists today, neither the ICCTA nor the FRSA preempts the operation and application of R.C. 5589.21. No opinion in this case has garnered a majority to say which of those two preempts R.C. 5589.21. Like Justice Fischer, I would hold that the FRSA, not the ICCTA, is the appropriate federal statutory scheme for examining whether preemption applies, because, as informed by R.C. 5589.20, R.C. 5589.21 is a public-safety statute focused exclusively on railroading. Thus, the FRSA, not the ICCTA, governs railroad safety. However, I would also hold that R.C. 5589.21 is not preempted by the FRSA. A safe-harbor provision in 49 U.S.C. 20106(a)(2) permits states to adopt or continue in force a law, regulation, or order related to railroad safety until the secretary of transportation prescribes a regulation or issues an order covering the subject matter of the state requirement. Because no federal regulations have been adopted to address the topic of blocked crossings, the FRSA does not preempt R.C. 5589.21. I would not find that federal regulations on brake testing, speed, or other topics operate to substantially subsume or implicitly preempt R.C. 5589.21.

**{¶ 78}** Finally, I note that if a federal regulation were to apply in such a way as to permit or require CSX to block a crossing with a stopped train for longer than the time permitted by R.C. 5589.21, then the exclusion in division C of R.C. 5589.21 would operate to render R.C. 5589.21 inapplicable. R.C. 5589.21 does not apply to the obstruction of a public street, road, or highway when the blockage is

caused by circumstances beyond the control of the railroad company. A federal regulation, if shown to require such a stoppage given the factual circumstances of a particular train, would be just such a circumstance, but that has not been shown in this record.

{¶ 79} For all these reasons, I would conclude that R.C. 5589.21 is not preempted by existing federal law. I therefore respectfully dissent.

DONNELLY, J., concurs in the foregoing opinion.

————————————

David W. Phillips, Union County Prosecuting Attorney, and Samantha M. Hobbs, Assistant Prosecuting Attorney, for appellee.

Mayer Brown, L.L.P., and Evan M. Tager; and Shumaker, Loop & Kendrick, L.L.P., Terrance K. Davis, and Nicholas T. Stack, for appellant.

Dave Yost, Attorney General, Benjamin M. Flowers, Solicitor General, and Zachery P. Keller, Deputy Solicitor General, urging affirmance for amicus curiae Ohio Attorney General Dave Yost.

Gallagher Sharp, L.L.P., Joseph J. Santoro, and Richard C.O. Rezie, urging reversal for amicus curiae Ohio Railroad Association.

Burns White, L.L.C., and Colleen A. Mountcastle; and Kathryn D. Kirmayer and Daniel Saphire, urging reversal for amicus curiae Association of American Railroads.

————————————